**In re PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Debtor.**

**Bankruptcy No. 88–0043.**

United States Bankruptcy Court, D. New Hampshire.

Oct. 17, 1989.

See also, 1st Cir., 884 F.2d 11.

Deasy & Dwyer, P.A. by J. Michael Deasy, Nashua, N.H., for Unsecured Creditors Committee.

Hinckley, Allen, Snyder & Comen by Joseph M. DiOrio, Providence, R.I., for New Hampshire Consumer Advocate.

Orr & Reno by Connie L. Rakowsky and Charles A. Szypszak, Concord, N.H., for New England Elec. Systems, et al.

Whitman & Ransom by Richard N. Tilton and Howard J. Berman, for Equity Committee.

Sanders & McDermott, P.A. by David J. Dunfey, Hampton, N.H., for Citicorp & Consol. Utilities & Communications, Inc.

Goodwin, Procter & Hoar by Christopher T. Katucki, Boston, Mass., for United Illuminating Co. (Seabrook Joint Owners).

McLane, Graf, Raulerson & Middleton by J. Christopher Marshall, Manchester, N.H., Hebb & Gitlin, Hartford, Conn., and Michael J. Reilly, for Prulease.

Stutman, Treister & Glatt by Richard Levin and Don Willenburg, Los Angeles, Cal., Sulloway, Hollis & Soden, Martin L. Gross, Concord, N.H., Catherine E. Shively, and Cahill, Gordon & Reindel by Thomas R. Jones and Gary W. Wolf, New York City, for Public Service of New Hampshire.

United States Trustee for the Districts of Me. Mass. N.H. and R.I. by Virginia A. Greiman, Wellesley Hills, Mass., for U.S. Trustee.

Devine, Millimet, Stahl & Branch by Mark W. Vaughn, Manchester, N.H., Office of N.H. Atty. Gen. by Larry M. Smukler, Sr. Asst. Atty. Gen., Concord, N.H., for State of N.H.

Wiggin & Nourie by Anthony C. Marts, Manchester, N.H., for First Fidelity Bank and Amoskeag Bank.

Kramer, Levin, Nessen, Kamin & Frankel by Joel B. Zweibel and Kenneth H. Eckstein, New York City, for the Unsecured Creditors Committee.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This chapter 11 contested matter involves a motion filed by the State of New Hampshire against the Debtor Public Service Company of New Hampshire ("PSNH"). The motion asks this Court to order the debtor to pay to some of its present and former commercial customers their pre-petition customer deposits in the ordinary course of PSNH's business.

This Court has jurisdiction under 28 U.S.C. §§ 157 and 1134, and the general reference Order dated February 1, 1985 by the U.S. District Court for the District of New Hampshire.

This matter came on for a hearing on May 6, 1989, after the parties had filed

briefs. This Court then took the matter under submission.

## FACTUAL BACKGROUND

PSNH is a public utility corporation engaged in providing electric service for designated service areas within the State of New Hampshire. PSNH must follow numerous statutory requirements and regulations of the New Hampshire Public Utilities Commission. PSNH must also abide by tariffs, which set forth the terms and conditions of service and the obligations of electric service customers. The tariff in effect at the time of the filing of the chapter 11 petition, Tariff NHPUC No. 31, which is still in effect, provides for deposits in section 3 in part as follows: [1]

3. DEPOSITS, PAYMENTS, REFUSAL OR DISCONTINUANCE OF SERVICE

Until a customer has established satisfactory credit relations or when unsatisfactory credit relations exist, the Company may require security in the form of a cash deposit. Such deposits should not be less than $10.00 nor more than the estimated bill for a period of two (2) high use months.

According to the schedules filed by PSNH, the amount of the deposits received from non-residential electric service customers at the time of the petition filing was approximately $1.5 million. PSNH has refused to repay the deposits in the ordinary course of business claiming they are unsecured debts and not entitled to priority. Normally, PSNH would return the deposits to customers following termination of service or after thirty-six consecutive months during which all bills have been paid without delinquency. The deposit would be either refunded by check, applied against the final bill when the customer terminates, or it may be applied against service rendered for the continuing customer who established good credit.

There are over four thousand non-residential customer accounts with deposits representing pre-petition amounts held by PSNH. If PSNH had not filed for bankruptcy and taken its current stance of refusing to refund deposits, more than one-half of the dollars being held would have been returned by this date under PSNH's normal practice.

With respect to residential deposits in amounts not exceeding $900, PSNH has

---

1. This tariff provision conforms to the requirements of N.H.Admin.Rules PUC § 303.04 (1989), which provides in part:
PUC 303.04 *Deposits.*
   (a) A utility, to protect against loss, may require a satisfactory cash deposit or other guarantee as a condition of new or continuing service ...
   (b) Deposit conditions. A cash deposit required pursuant to these rules, is subject to the following terms and conditions:
   (1) No deposit shall be less than $10.00 nor more than the estimated charge for utility service for a period of 2 high-use billing periods. The highest use period will not be used in determining the amount of deposit.
   (2) Interest shall be payable by the utility on all deposits held 6 months or more at the rate of 10 percent annually and shall be credited with simple annual interest upon the service account of the customers or paid upon the refund of deposit.
   (3) Deposits, plus accrued interest thereon, less any amount due the company, shall be refunded:
      a. Within 30 days of termination service, or
      b. When all bills have been paid without delinquency for 12 consecutive months for a

residential customer, and 36 consecutive months for a non-residential customer; provided, however, with the agreement of the customer, deposits on continuing accounts may be applied against an account until the balance of the deposit is exhausted. When a deposit is applied against an account which has been terminated, interest shall cease to be accumulated on the balance at the date of termination, and the balance shall be returned promptly to the customer.
   (4) A utility shall maintain a detailed record of all deposits received from customers, showing the name of the customer, location of the service, date of the making and amount of the deposit, the amount of interest and date paid as well as a record of any amount retained by the utility upon termination to settle a delinquent account.
   (5) A utility shall provide each customer posting a cash deposit a receipt containing, as a minimum, the customer's name, the place, the date and amount of payment; the name and signature of the employee receiving the deposit; and a statement of the terms and conditions governing the receipt, retention, and refund of deposits.

previously applied for and obtained permission from this Court to apply such deposits in the ordinary course of business. However, PSNH has refused to refund the non-residential deposits in the ordinary course of business.

## PRELIMINARY MATTERS

### A. *Standing*

■ The debtor contests the standing of the Attorney General of New Hampshire to represent non-consumer creditors in this matter. However, since the state has the power to enforce PSNH compliance with deposit laws, the state may properly bring this motion. Moreover, the state is generally empowered to protect consumers from public utilities, and the need for a "representative" is clear due to the small size of some of these claims.

### B. *Nature of Proceeding*

The debtor contends that the state cannot bring this action by motion, but must bring an adversary proceeding. However, this Court has the power to resolve this matter on the pleadings before it, 11 U.S.C. § 105, and finds the characterization of the proceeding irrelevant in resolving this dispute since there are no factual issues in dispute.

## THE RECOUPMENT THEORY

The state contends that the non-residential deposits are recoverable under a recoupment theory. The nature and limits of recoupment need to be discussed before applying it to this case.

■ Recoupment has to be distinguished from setoff, although both doctrines have the effect of preferring one creditor over others. Setoff is permitted by Section 553 of the Code, and allows a mutual pre-petition claim of a creditor to be setoff against a pre-petition claim of the debtor which arose out of a different transaction than the creditor's claim. Recoupment exists independent of the Code, and allows a creditor to reduce the amount of a debtor's claim, by even keeping post-petition payments due to the debtor, due to matters arising out of the same transaction. A frequently cited example is the case of *Waldschmidt v. CBS, Inc.*, 14 B.R. 309 (M.D.Tenn.1981). In this case, a recording company made advance royalty payments to a musician who subsequently filed bankruptcy. The company then kept post-petition royalties it received from record sales to recover the amount of the advances. When challenged, the company was allowed to do this under a recoupment theory rather than having to maintain a claim as an unsecured creditor for the advances and turn over the royalties.

■ Recoupment is an equitable doctrine, see *In re B & L Oil Co.*, 782 F.2d 155, 159 (10th Cir.1986), so one might expect it to be broad. However, it "should be narrowly construed as an exception to the general rule against preferring one creditor over another." *Electronic Metal Prod., Inc. v. Honeywell, Inc.*, 95 B.R. 768, 770 (D.Colo.1989).

■ The first limitation on the doctrine is that there must be a *single* contract. See *In re Denby Stores, Inc.*, 86 B.R. 768, 782 (Bankr.S.D.N.Y.1988). One case allowing recoupment under one contract is *In re B & L Oil Co., supra,* in which a buyer of crude oil under a long-term contract was allowed to recoup a mistaken overpayment for pre-petition services by withholding payment on post-petition services. Another case allowing recoupment is *In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427 (Bankr.S.D.N.Y. 1982), aff'd 34 B.R. 385 (S.D.N.Y.1983), in which the government under a single provider agreement recovered Medicare overpayments from post-bankruptcy reimbursements to a hospital that filed under chapter 11.[2] Some cases finding separate transactions include: *In re California Canners and Growers*, 62 B.R. 18 (Bankr. 9th Cir. 1986) (separate contracts to purchase canned goods); *In re Buckley & Assoc.*

---

**2.** For additional cases involving recoupment under a single contract see *In re Midwest Serv. and Supply Co., Inc.*, 44 B.R. 262 (D.Utah 1983); *In* *re Alpco, Inc.*, 62 B.R. 184 (Bankr.S.D. Ohio 1986); *In re American Central Airlines, Inc.*, 60 B.R. 587 (Bankr.N.D. Iowa 1986).

*Ins., Inc.,* 67 B.R. 331 (Bankr.E.D.Tenn. 1986) aff'd 78 B.R. 155 (E.D.Tenn.1987) (profit sharing agreement and agency contract were separate).[3]

There is little question that the deposits are part of a single electricity contract that each non-residential customer had with PSNH. A case supporting this conclusion is *Brooks Shoe Mfg. Co., Inc. v. United Tel. Co.,* 39 B.R. 980 (E.D.Pa.1984). In this case, a telephone utility was allowed to apply a deposit to a pre-petition telephone bill under a recoupment theory: "In short, it is not at all clear to me that the situation involved setoff at all. Rather, it is more nearly akin to recoupment which is plainly permitted by the Bankruptcy Code." *Id.* at 982. In making its ruling, the court held one transaction was involved between the parties. The Court analogized the deposit to an advance payment for telephone service, or alternatively, to a security interest. Likewise, the deposits of the commercial users were part of one transaction.[4]

The second limitation on the doctrine is that there must be some type of "overpayment", whether accidentally made, see, e.g. *B & L Oil Co., supra,* or contractually made, see, e.g., *Waldschmidt v. CBS, Inc., supra.* See generally *In re Denby Stores, Inc.,* 86 B.R. 768, 782 (Bankr.S.D.N.Y. 1988). In our case, the deposits are designed to be recovered by the commercial customer who stays in operation and pays his/her bills for thirty-six consecutive months by crediting it against their account. Alternatively, if the customer goes out of business then the deposit is applied against his/her final bill. In short, there is always an expectation that the deposit will be returned. This is clearly a type of "overpayment". An analogous case decided by Judge Queenan of Massachusetts is *In re Mohawk Indus., Inc.,* 82 B.R. 174 (Bankr.D.Mass.1987). In this case, the debtor was entitled to advance progress payments to cover some of the debtor's costs, which would be recovered upon subsequent delivery of the goods. The advances were made pre-petition, and post-petition the creditor was allowed to deduct the amount of the payments from the value of the goods under a recoupment theory. (He would have been able to do this under the contract if the debtor was not in bankruptcy). Like these progress payments, the deposits were intended to cover the cost of PSNH doing business,[5] but were always contractually obligated to be returned.

The debtor suggests a third limitation that should apply to this case: that recoupment can only be used as a defense. This argument is misplaced. It is true that in most recoupment cases the creditor has funds or has taken action to offset an overpayment and is the defendant in an action. But this is not always the case. In *B & L Oil Co., supra,* the creditor sought a declaration that the prior receipt of oil post-petition could be applied to its pre-petition overpayment, and that it could receive oil in the future without having to pay until the overpayment was cured. This was one creditor on the offensive. In the present case, the doctrine involves the offsetting of competing claims arising out of the same

---

3. For additional cases denying recoupment due to multiple transactions see *Electronic Metal Products, Inc. v. Honeywell, Inc.,* 95 B.R. 768 (D.Colo.1989); *Westinghouse Elec. Corp. v. Fidelity and Deposit Co.,* 63 B.R. 18 (E.D.Pa.1986); and *In re Denby Stores, Inc.,* 86 B.R. 768 (Bankr. S.D.N.Y.1988).

4. This Court is aware that the decision in the recent case of *In re Cole,* 104 B.R. 736, (Bankr. D.Md.1989), indicates that monthly electric bills and electric service deposits involve separate obligations. In the *Cole* case, the Court held that such separate obligations meant that setoff, not recoupment, would apply and that the debtor's claim for exemption of a pre-petition security deposit would prevail over the utility's at-

tempt to apply the deposit against its pre-petition claim. Interestingly, the effect of decision in *Cole* was to *allow* the debtor to "cross the bankruptcy filing divide" by then using the deposit monies to satisfy her § 366 obligation to provide reasonable assurance regarding post-petition electrical service. To the extent that the "separate obligations" point in *Cole* was essential to the decision, and to the extent it differs with the *Brooks* decision, I believe that *Cole* is not persuasive; the monthly service and deposit in every practical sense are part of one electricity contract in my judgment.

5. Specifically, it is to protect PSNH from suffering losses due to uncollectible receivables.

transaction, with the recouping party limited to recovering only the compelled "overpayment" that this regulated utility debtor clearly was required to return once the limiting conditions were satisfied.

The debtor suggests a final limitation on the recoupment theory: that it conflicts with the debtor's right to elect to assume or reject an executory contract. The debtor cites no recoupment cases for this proposition. This is not surprising since recoupment is allowed before debtors make their Section 365 election. As Judge Queenan remarked in *In re Mohawak Indus., Inc.*, 82 B.R. 174, 177 (Bankr.D.Mass.1987):

> It may recoup ... even though the Debtor was never authorized by the Court to assume that contract pursuant to 11 U.S.C. § 365. Most courts that have considered this issue permit recoupment regardless of the occurrence of a bankruptcy filing and regardless of the absence of formal contract assumption by the Debtor. *In re Midwest Service and Supply Co., Inc.*, 44 B.R. 262 (D.Utah 1983); *Rakozy v. Reiman Construction (In re Clowards, Inc.)*, 42 B.R. 627 (Bankr.D. Idaho 1984); *In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427 (Bankr.S.D.N.Y.1982); *Waldschmidt v. CBS, Inc., (In re Jones )*, 14 B.R. 309 (D.C.M.D.Tenn.1981). They do so not because the debtor is held to have assumed the contract under § 365, but rather on the ground that if a debtor seeks the benefit of a contract it must take the burden under that contract as well, for much the same reason that § 365 permits assumption of an executory contract only if the debtor makes the other party whole and provides adequate assurance of future performance.

## "RECOUPMENT PLUS"

Although this Court concludes that the limitations on applying recoupment have been met in this case, there is an additional equitable reason why recoupment, or a concept very akin to recoupment, should be allowed in this case. The commercial user deposits here in question were not voluntary payments extended to the debtor on the basis of a risk assessment as to dealing with the debtor on an unsecured credit basis, as is generally true of trade creditors and unsecured debenture holders who must consciously make a determination whether to deal with the debtor on that basis, but instead were payments compelled by a regulated monopoly electric utility company acting under a tariff approved by the New Hampshire Public Utilities Commission. The tariff required such deposits as a condition of obtaining electrical service. See Section 3 of Tariff NHPUC No. 31. No other alternatives were available to such depositors and in no sense could they be deemed to have acted "voluntarily" in the sense of having made a decision as to the creditworthiness of the debtor and a decision to deal with the debtor on a general unsecured basis. This factor clearly distinguishes these customer-depositors from the other "general creditors" in this estate, i.e., trade creditors and debenture holders, who *did* act voluntarily and decide to extend credit on an unsecured basis.

The situation is directly analogous to the case of *mistaken* overpayments to a debtor which have been found to be recoverable under the recoupment doctrine, or something akin to it, notwithstanding a contention that such result gave improper preferential treatment to such claimants. As noted by the court of appeals in *In re B & L Oil Co.*, 782 F.2d 155, 159 (10th Cir.1986):

> Further, bankruptcy courts apply recoupment as an equitable doctrine. Here we face a question of unjust enrichment. The situation before us is not one in which the creditor seeking relief consciously made a loan, extended credit, or made payments required by a contract, as did the bankrupt's ordinary creditors. Ashland paid the sums to B & L by mistake. Although common sharing may be required in some mistake cases by the bankruptcy laws' cleavage rules, allowing B & L's other creditors to share in this money would give them a windfall, a classic case of unjust enrichment.

Moreover, the present case is also analogous to the situation of *segregated* security deposits, in a non-regulated, non-monopoly business operation, in which such deposits

are routinely recoverable in bankruptcy proceedings. In the case of *Brooks Shoe Mfg. Co., Inc. v. United Tel. Co.*, 39 B.R. 980, 983 (E.D.Pa.1984), District Judge Fullam, in a novel application of recoupment theory to deposits held by a telephone company, noted that the normal requirement that segregation of security deposits be proven to support recovery of same, notwithstanding a subsequent bankruptcy filing, was not applicable in the regulated utility context:

> The accounting systems of public utilities are closely regulated. Under applicable regulations, segregation of security deposits is not required; and, in the context of the present dispute, it is difficult to perceive any useful purpose to be served by imposing that requirement.

> It seems to me that much of the confusion engendered in this case is attributable to attempting to equate a security deposit such as that involved here with bank deposits. In the latter situation, the depositor has unfettered access to the funds at all times, and whatever obligation the bank might seek to set off is truly an independent debt. Even more importantly such independent offsetting obligation would almost inevitably prove to have been an antecedent debt.

In the PSNH situation, the company was required to treat these deposits under the tariff and regulations as funds held for the customer. Indeed, the deposits are not supposed to be included in rate base. See *Legislative Util. Consumers' Council v. Granite State Elec. Co.*, 119 N.H. 359, 402 A.2d 644 (1979). The company accordingly was under the complete control of its regulatory agency, which would assure that such deposits would be returned when the limiting conditions were satisfied eliminating the need for any escrowing or segregation. It would never occur to any commercial user making the required deposit that the deposit return was in any jeopardy because it wasn't segregated. The depositor would expect that the regulatory agency would assure that the company would honor the deposit requirement in the future. That assurance was and is the functional equivalent of segregation of the security deposit in my judgment when dealing with a regulated monopoly utility company.

It also must be recognized as a practical matter, no matter what the outcome of this reorganization proceeding, that reorganized PSNH or any acquiring entity under a plan of reorganization will in fact continue to provide electric service to its customers in New Hampshire and will continue to be subject to the tariffs and regulation of the New Hampshire Public Utilities Commission regarding the company's dealings with its retail customers—whether residential or nonresidential. This is not the more normal case—in fact just about every other chapter 11 case to date—in which there is some uncertainty during the pre-plan confirmation stage as to whether the company or any successor will in fact continue in business providing the same services.

For that additional reason it is obvious that these commercial deposit refund rights *will* ultimately be honored and no good purpose is served in withholding such payments to protect against any alternative result that may occur by virtue of the reorganization. It is inconceivable that this court could or would approve a plan of reorganization for a continuing electric utility in this State that did not honor existing vested rights to return regulatory-compelled deposits to the utility's customers. Whether treated as compliance with regulatory requirements or as a mandatory separate classification required by the concept of recoupment, or a concept akin to recoupment, as set forth above, the result is the same, *i.e.*, these depositors will receive refund in full of their compelled deposits. Accordingly, it is unnecessary for the court on this matter to reach the further issue argued by the parties in terms of whether Bankruptcy Code provisions override the effect of the New Hampshire tariffs and regulatory requirements in this instance.

## CONCLUSION

PSNH should immediately return to the normal course of refunding pre-petition deposits held for non-residential customers

who have closed their accounts, and for non-residential customers who have thirty-six months of service establishing good credit. The parties shall submit and settle a form of order in accordance with this Memorandum Opinion at the next regularly-scheduled hearing in this case.