In the Matter of KM GROUP, INC., Debtor.

KM GROUP, INC., Plaintiff,

v.

The CINCINNATI GAS & ELECTRIC COMPANY, Defendant.

Bankruptcy No. 1–91–00934.
Adv. No. 1–91–0085.

United States Bankruptcy Court, S.D. Ohio, W.D.

July 24, 1991.

Jeffrey Lurie, Cincinnati, Ohio, for plaintiff.

Stephen Lerner, Cincinnati, Ohio, for defendant.

### FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

J. VINCENT AUG, Jr., Bankruptcy Judge.

This matter is before the Court on the Debtor's Complaint to Compel Turnover of

Property or, in the Alternative, to Reject Executory Contract and Receive Immediate Return of Deposit (Adv. Doc. 1); the Debtor's Motion for Expedited Hearing On Debtor's Turnover Complaint Against Cincinnati Gas & Electric Company or in the Alternative to Reject Executory Contract and Receive Immediate Return of Advance Payment (Adv. Doc. 3) and the Memorandum of the Cincinnati Gas & Electric Company ("CG & E") in Opposition to Second Claim for Relief of KM Group, Inc. (Adv. Doc. 7).

Pursuant to the Complaint, the Debtor requested in its First Claim for Relief turnover of $70,000 being held by CG & E as the result of a Gas Main Extension Agreement ("Agreement") which the Debtor signed with CG & E on February 3, 1989. Debtor requested the return of the funds on the grounds that the funds constituted an "advance payment" which Debtor contends is property it may use, sell or lease under 11 U.S.C. § 363. In its Second Claim for Relief Debtor requested approval to reject the Agreement as an executory contract under 11 U.S.C. § 365 and return of the funds. Debtor further sought an expedited hearing on the Complaint.

Pursuant to the agreement of the parties, the Second Claim for Relief was bifurcated from the First Claim and is being treated herein as a motion to reject an executory contract under 11 U.S.C. § 365(a). The parties further agreed to a hearing date of April 26, 1991. For the reasons set forth herein, the Court holds that the subject contract is not executory and, therefore, may not be rejected by the Debtor. The motion is DENIED.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

The Debtor is a real estate developer. Prior to commencing this Chapter 11 case, the Debtor began construction on a development of residential homes known as "Black Horse Run." In order to provide future home owners in Black Horse Run with the opportunity to receive gas service, the Debtor contacted CG & E regarding the extension of an existing gas main into the development. As a result, the Debtor and CG & E entered into the Extension Agreement on February 3, 1989.

Pursuant to the Agreement, CG & E agreed to extend its existing gas main a distance of 9,400 feet in order to enable purchasers of real property from the Debtor and others to have access to gas service. The terms of the Agreement reflect CG & E's "Rider X—Main Extension Policy" ("Rider X"). Rider X is contained within CG & E's Tariff PUCO No. 18 which has been approved by Order of the Public Utilities Commission of Ohio ("PUCO") effective January 30, 1986. Rider X reflects PUCO's established policy regarding the allocation of risk and sharing of expenses incurred by CG & E in extending gas mains in excess of 100 feet per customer. It is based on the premise that a public utility should not bear the entire cost of extending a gas main for the development of new residential or commercial property. Ohio Rev.Code Ann. § 4905.54 requires CG & E to comply with all orders of the PUCO and CG & E is not permitted to depart from the terms and conditions imposed by Rider X without the approval of the PUCO.

As a public utility, CG & E recovers its significant capital expenditures to extend gas mains to a proposed real estate development by including that cost in its "rate base" for service supplied to its customers. CG & E is then compensated for its investment by the customers as part of their rates. The payments received from the Rider X applicant reduce the cost of providing service to the customers and are not recovered through CG & E's rates except when the conditions of reimbursement have been satisfied. The addition of new customers increases the rate base over which the costs are spread. If, however, the real estate development fails and an insufficient number of customers are hooked up to the gas main, an additional burden is placed on CG & E and its customers. Thus, Rider X permits CG & E, at its option, to charge the applicant for the entire cost of extending the main over 100 feet.

In the instant case and in accordance with the provisions of Rider X, CG & E charged the Debtor $10 per foot of extension, or $94,000. CG & E's costs to extend the gas main 9,400 feet were in excess of $298,000. CG & E funded approximately $204,000 or 68% of the extension costs.

With respect to reimbursement, Rider X provides as follows:

3. An applicant desiring an extension to a proposed real estate subdivision may be required to pay the entire cost of the extension. Each year for a period of up to but not exceeding six (6) years, which begins on the effective date of the main extension contract, the Company shall refund to the applicant, who paid for the extension, a sum equivalent to the cost of one hundred (100) feet of the extension installed for each additional customer connected during the year, but in no case shall the total amount refunded over the six (6) year period exceed the amount paid to the Company. There shall be no refunds after the end of the said six (6) year period.

According to CG & E, the rationale behind this reimbursement policy is that once a customer has been connected to the gas main there is a reasonable expectation that revenues will be forthcoming. Therefore, the applicant is entitled to reimbursement since the costs of the extension have been defrayed by the new customers. Under the terms of Rider X and the Extension Agreement, however, the applicant is entitled to reimbursement only upon completion of customer hookups.

At no time does the applicant have a legal or equitable interest in any funds or assets of CG & E. By the same token, Rider X does not obligate the applicant to obtain customer hookups.

At the time of the hearing on April 26, 1991 the Debtor had been reimbursed approximately $24,000 as the result of customer hook-ups. If an additional 70 customers are connected to the gas main within the time specified by the Agreement, the Debtor may be entitled to an additional $70,000 reimbursement.

Section 365(a) of the Bankruptcy Code provides that, "the trustee, subject to the court's approval, may assume or reject any executory contract ... of the debtor." While the term "executory contract" is not defined in the Bankruptcy Code, the Sixth Circuit Court of Appeals sets forth the standard to which this Court is bound in *In re Terrell*, 892 F.2d 469 (6th Cir.1989):

The Bankruptcy Code does not explicitly define the term "executory contract." The legislative history, however, indicates that Congress intended the term to be defined as a contract "on which performance remains due to some extent on both sides." S.Rep No. 95–989, 95th Cong., 2d Sess. 58, reprinted in 1978 U.S.Code Cong. & Admn.News 5787, 5844; H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 347, reprinted in 1978 U.S.Code Cong. & Admn. News 5785, 5963, 6303. *See also, In re Jolly*, 574 F.2d 349, 350–51 (6th Cir.), *cert. denied* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978).

*Id.* at 471.

■ The Debtor's motion requests the approval of this Court to reject the Agreement as an executory contract under § 365(a). The Debtor asserts that as the result of its rejection of the Agreement it is entitled to obtain the balance of the unreimbursed funds paid to CG & E without complying with the reimbursement requirements in the Agreement for the following reasons: (1) the Agreement is executory because the Debtor has an obligation to use its best efforts to develop Phase One of the Black Horse Run development, sell the lots and have homes built on the lots which will connect to the gas main extension and thus entitle Debtor to obtain reimbursement; (2) the Agreement is a contract of adhesion because the Debtor was not free to negotiate the terms upon which the gas main would be extended; and, (3) the $94,000 payment is analogous to a security deposit on a lease to which the tenant is entitled.

CG & E argues that the Agreement is not executory because all material obligations of the parties under the Agreement have been performed and the only remaining aspect is the possible reimbursement of

funds to the Debtor after specific action by non-parties to the agreement. CG & E further argues that even if the Agreement was determined to be executory, the rejection of the Agreement would not trigger any payment of funds to the Debtor by CG & E as a consequence of the rejection.

The Debtor asks this Court to consider the equities inherent in its attempt to restructure its business; however it has cited no legal or factual basis for the position that reimbursement would flow from the rejection of the Agreement.

The Agreement is not executory within the meaning of § 365(a) of the Bankruptcy Code. The Court finds no requirement under the Agreement that the Debtor sell lots in the development and obtain customers to hook up to the gas main to obtain reimbursement. The parties' obligations under the Agreement are completed. The Debtor's entitlement to reimbursement is automatic under the terms of the contract and nothing further is required of the Debtor. Therefore the Agreement is not executory.

█ The Debtor also argues that it should be entitled to reject the Agreement because it is a contract of adhesion. The Debtor bases this argument on the contention that it was unable to negotiate the terms of the Agreement. The Debtor cites *In re Public Service Company of New Hampshire*, 107 B.R. 441 (Bankr. D.N.H.1989) in support of this proposition. In that case the court held that the nonresidential customers of the regulated monopoly power company were entitled to the repayment of their security deposits, even outside the confines of the customer's applicable agreements. The court said in part:

> The commercial user deposits here in question were not voluntary payments extended to the debtor on the basis of a risk assessment as to dealing with the debtor on an unsecured credit basis, as is generally true of trade creditors and unsecured debenture holders who must consciously make a determination whether to deal with the debtor on that basis, but instead were payments compelled by a regulated monopoly electric utility company acting under a tariff approved by the New Hampshire Public Utilities Commission. The tariff required such deposits as a condition of obtaining electrical service. * * * No other alternatives were available to such depositors and in no sense could they be deemed to have acted 'voluntarily' * * *.

*Id.* at 446.

The instant case can readily be distinguished. The payments herein *were* in the nature of risk assessment and cost sharing, not a security deposit. In addition, the Debtor voluntarily decided to provide gas rather than other forms of fuel to potential customers. Such decision was based on its apparent belief that gas would make the properties more attractive for sale. Furthermore, the provisions of the Agreement were established in accordance with the policies of Rider X. The Debtor was treated fairly and in a manner consistent with other similarly situated applicants for a gas main extension. The question here is not whether this Court has the power to address executory contracts as between a debtor and a regulated public utility, but rather, does this Court desire to establish special provisions or exceptions to the established policies of the public utility and the PUCO. The Court declines to do so and finds that the Extension Agreement is not a contract of adhesion.

█ Finally, the Debtor argues that the Agreement is tantamount to a lease and the unreimbursed portion of the funds used to share the costs of construction are tantamount to a security deposit. As stated previously, the Court does not view these funds as a security deposit. The payment from the Debtor did not constitute security for the Debtor's obligations under the Agreement. It was a one-time obligation to share the costs of extending the gas main. Thus, the analogy of the Extension Agreement to a lease is inappropriate and does not form a basis upon which to reject the agreement.

For the reasons set forth above, which shall constitute this Court's Findings of Fact and Conclusions of Law, the Court

hereby denies the Debtor's motion to reject the Extension Agreement.

IT IS SO ORDERED.