In re James WOKER and Linda
Woker, d/b/a Woker Dairy
Farms, Debtor(s).

Gibson D. KARNES, Trustee of the Estate of James and Linda
Woker, Plaintiff,

v.

RAKERS ELEVATOR, INC., Defendant.

**Bankruptcy No. BK 88–30886.
Adv. No. 90–0001.**

United States Bankruptcy Court,
S.D. Illinois.

Oct. 22, 1990.

Steven T. Stanton, East St. Louis, Ill., for Trustee.

Norman Conrad, Breese, Ill., for defendant Rakers Elevator, Inc.

## MEMORANDUM AND ORDER

KENNETH J. MEYERS, Bankruptcy Judge.

The debtors, who are grain and dairy farmers, executed "future delivery" contracts in the spring of 1988 with the defendant, Rakers Elevator, Inc. ("Rakers"), by which they sold soybeans to Rakers at a specified price to be paid upon delivery of the grain in the fall. During the course of the year, the debtors purchased seed, fertilizer, and chemicals from Rakers on a credit basis. When the soybeans were delivered to Rakers in November 1988, Rakers applied the proceeds of sale to offset the debtors' outstanding account balance with Rakers.

Following the debtors' bankruptcy filing in December 1988, the trustee brought this preference action against Rakers to recov-

er the amount of the soybean proceeds that had been applied to the debtors' account. Rakers contends that the trustee has failed to prove the elements of a preference and that judgment should be entered in its favor. Specifically, Rakers asserts that the evidence shows that "transfer" of the soybeans occurred in May 1988 when the grain contracts were executed, which was more than 90 days before the debtors' bankruptcy filing, and not in November 1988 when the soybeans were delivered to Rakers. Rakers further contends that the sale of supplies to the debtors was conditioned upon the debtors' execution of such contracts and that Rakers thus had a right to set-off the indebtedness owing to it when Rakers received the soybean proceeds in the fall. Rakers additionally asserts that its application of the soybean proceeds to the debtors' account was in the ordinary course of business because it had used this same procedure on prior occasions. Finally, Rakers contends that the trustee may not recover the soybean proceeds as a preference where this recovery would benefit only the debtors, who have signed a reaffirmation agreement with a secured creditor holding a lien on the debtors' crops.

The grain contracts in question were signed by the debtors on May 11 and May 20, 1988. The contracts were entitled "Purchase Contract" and provided that "Seller hereby sells and agrees to deliver and Buyer hereby purchases and agrees to receive" a total of 3,200 bushels of soybeans at $7.04 and $7.50 per bushel, with delivery to be from September to November 1988. The "Remarks" section of the contracts contained the words "To be applied to account." Rakers stipulated that this language was added to the contracts as an intraoffice procedure after the contracts were signed and that the language had not been intended to be a term of the contracts.

On November 1, 2, and 4, 1988, Rakers received delivery of the soybeans covered by the May contracts. On November 4, 1988, Rakers applied the proceeds from the sale of these soybeans to the debtors' account, offsetting the debtors' account balance of $25,052.48 by the amount of $24,137.62. The debtors subsequently filed their bankruptcy petition on December 13, 1988.

At trial, Jerry Rakers, owner and operator of Rakers Elevator, Inc.,[1] testified that in February 1988 the debtors talked to him about advancing supplies needed by them to produce their crops that year. Rakers told the debtors that he would advance supplies to them on a credit basis if they would sign contracts selling their grain to him. Rakers testified that on the "very day" of his meeting with the debtors on February 9, 1988, the debtors signed a contract selling wheat to him for future delivery. The debtors executed additional wheat contracts with Rakers on February 22 and May 19, 1988, as well as the soybean contracts of May 1988. Rakers stated that the soybean contracts were executed at his request so that the debtors could obtain supplies on credit, with the understanding that the proceeds would be applied to the debtors' account when the soybeans were delivered in the fall.

Rakers testified that until the fall of 1987, he had always sold supplies to the debtors on an open account basis, and the debtors would pay for that season's supplies when they harvested their crops. In mid–1987, Rakers noticed "problems" with the debtors' payment record. Rakers thereafter changed his method of doing business with the debtors, requiring that they sign contracts for the sale of grain before he would advance supplies. The debtors accordingly sold grain on contract to Rakers in September 1987, and, when the grain was harvested in October 1987, Rakers applied the proceeds from sale of the grain to the debtors' account balance.

Rakers acknowledged that the debtors' grain was subject to a security interest in favor of the First National Bank of Carlyle ("Bank"), but stated that he had an agree-

---

**1.** Because of the identity of interest between Jerry Rakers and his company, Rakers Elevator, Inc., the Court will refer to both as "Rakers."

The distinction between the two should be apparent from the context in which the reference appears.

ment with the Bank that he could "get his money first" from the grain sales proceeds if he would furnish supplies to produce the debtors' crops. Rakers testified that on occasions when a farmer seeking credit already had his crops encumbered by the Bank's lien, Rakers would call the Bank and arrange to advance supplies for the farmer's crops if he could get paid out of grain sales proceeds before remitting the balance to the Bank. Rakers stated that he and the Bank worked closely together and that this was "a deal keep everybody operating." On cross-examination, Rakers reiterated that he did not himself have a security agreement with the debtors but he "had an agreement with the Bank."

When the wheat subject to the February 9 contract was delivered to Rakers in June 1988, the proceeds of sale were applied to the debtors' account. In July, the debtors delivered wheat to fill the February 22, and May 19 contracts, along with another truckload of wheat subject to a contract of July 1, 1988.[2] Rakers sold the wheat for the prices specified in the respective contracts and applied the sales proceeds from the July contract to the debtors' account balance, while remitting the proceeds from the two earlier contracts to the debtors and the Bank jointly because, as Rakers stated, "this was the agreement."

According to Rakers' testimony, he told the debtors at the February 1988 meeting that he would need soybean contracts in addition to the wheat contracts, and the debtors agreed to sign such contracts when the price for soybeans reached a certain level. Rakers testified that the Bank had agreed that he could get $25,000 from the sale of the debtors' soybeans. Rakers advanced supplies to the debtors only upon the condition that they sign these contracts, and he monitored the debtors' account closely to make sure they didn't order more supplies than he had contracts for.

Rakers' testimony concerning the grain sales contracts was contradicted by debtor Jim Woker. Woker denied that the debtors

signed the contracts for the purpose of obtaining supplies on credit for their 1988 crop. He testified that he "did not remember" Jerry Rakers telling the debtors he would give them credit only if they executed grain sales contracts with Rakers. Rather, Woker stated that the reason the debtors signed the sales contracts for wheat and soybeans was that the crops "were selling at a good price" and he wanted to get that price. Woker agreed that the debtors talked to Rakers in February 1988 about obtaining supplies for the year but stated that they "did not do anything about it" that day.

Woker testified that he did not object when Rakers applied the sales proceeds of the wheat contracts to the debtors' account in mid–1988 because he was able to pay the loan at the Bank and "the rest I let them [Rakers] have." Although the wheat was subject to the Bank's security interest, the Bank let the debtors "do whatever [they] wanted with the wheat that was left" after they had the notes paid that were due at that time. The summer of 1988 was a bad drought year, and the debtors' soybean yields were cut in half. In the fall of 1988, Woker had planned to pay the Bank with the soybean proceeds and then borrow from the Bank to pay Rakers. However, when Rakers "kept the beans" in November 1988, the debtors were unable to go back to the Bank for money to pay Rakers.

After the Wokers filed for bankruptcy in December 1988, they signed a reaffirmation agreement in which they promised to repay the debt to the Bank that was secured by their 1988 soybean crop. At the time of trial, the $25,900 note to the Bank had been paid down to $17,000 or $18,000. The reaffirmation agreement provided that any proceeds recovered by the trustee in his preference action against Rakers and paid over to the Bank by reason of its perfected security interest in the debtors' soybeans would be applied to reduce the Wokers' indebtedness on the note.

---

**2.** The contract of July 1, 1988, was not signed by the parties. However, it appears that delivery and sale of the wheat were made pursuant to the terms of the contract.

### "Transfer" of the Debtors' Property

■ In order to prevail in a preference action under 11 U.S.C. § 547, the trustee must prove all the elements of an avoidable preference. One of the key elements of a preference is the "transfer" of an interest of the debtor in property within the applicable period—here, 90 days—prior to bankruptcy. 11 U.S.C. § 547(b)(4)(A).

Rakers contends that "transfer" of the debtors' property took place when the debtors signed the two soybean contracts in May, selling the grain to it with the promise of future delivery. Rakers asserts that upon signing the contracts, the debtors conveyed all their rights to the soybeans, so that transfer was complete at that time, and that delivery of the soybeans in the fall was simply performance of the executory contracts signed in May. For this reason, Rakers maintains that the debtors' transfer of the soybeans is protected from the trustee's avoiding powers because it was outside the 90–day preference period of § 547.

Rakers' argument is misplaced in that it focuses on transfer of rights to the soybeans themselves rather than on the disposition of proceeds derived from the sale of the soybeans. The contracts signed by the debtors obligated Rakers to pay proceeds from the sale of the soybeans to the debtors upon delivery of the soybeans to Rakers. Thus, the relevant transfer occurred, not when the debtors signed the contracts selling the soybeans to Rakers, but when Rakers failed to pay the proceeds from this sale to the debtors and, instead, applied the proceeds to the debtors' account. It was at this point in time, on November 4, 1988, that "transfer" of the debtors' property occurred, well within the 90–day preference period of § 547.

The cases cited by Rakers, *Matter of E.P. Hayes, Inc.*, 29 B.R. 907 (Bankr.D. Conn.1983); and *In re AOV Industries, Inc.*, 64 B.R. 933 (Bankr.D.Dist.Col.1986) are distinguishable on their facts from the present case. *E.P. Hayes* involved an assignment of payments executed by the debtor prior to the preference period. The court held that payments made to the creditor pursuant to this assignment were not avoidable although received within the preference period because transfer of the debtor's right to receive payments occurred upon execution of the assignment. Similarly, in *AOV Industries*, the creditor received proceeds during the preference period pursuant to letters of credit transferred to it by the debtor outside the preference period. The court ruled that payments under the letters of credit were not preferential because the debtor had no interest in the proceeds once transfer of the letters of credit had been accomplished. The debtors' execution of the grain sales contracts here was unlike the transfers in the cited cases in that the debtors retained the right to payment for the soybeans upon delivery of the soybeans in the fall, which came within the 90–day preference period.

### Right to Setoff

Rakers contends that even if the Court finds that the transfer occurred in November 1988, it had the right to setoff the amount owed by the debtors with the proceeds from sale of the soybeans. Rakers points out that it advanced supplies to the debtors on the condition that they execute the soybean contracts at issue and asserts that this gave Rakers a superior right to the proceeds from sale of the soybeans.

■ Assertion of the right to setoff constitutes an affirmative defense to the trustee's preference action, as a valid setoff does not constitute a "transfer" that may be recovered by the trustee under § 547. *In re Balducci Oil Co.*, 33 B.R. 847 (Bankr.Colo.1983). Section 553 governing setoffs recognizes the right to setoff while setting forth special limits on the allowance of setoff, including an "improvement of position" test that mirrors the preference prohibition against creditors advancing their position vis-a-vis other creditors within 90 days of bankruptcy. *Id.; see* 11 U.S.C. § 553(b). The Bankruptcy Code, however, does not create any new right of setoff where none exists under nonbankruptcy law, and defendants asserting the affirmative defense of setoff must establish both their entitlement to setoff and

their compliance with the limits of § 553. *Balducci.*

■ It is undisputed that Rakers had no security interest in the debtors' soybeans and that the soybeans were, instead, subject to a perfected security interest in favor of the Bank. Rakers asserts, however, that it had an agreement both with the debtors and with the Bank that the soybean proceeds would be applied to the debtors' account. Rakers contends, therefore, that its setoff was proper and cannot be avoided by the trustee.

At trial, the debtors denied that an agreement was made to offset their account with the soybean proceeds and disputed Jerry Rakers' testimony that execution of the May contracts was in furtherance of such an agreement. The contracts themselves contained no indication that the proceeds were to be applied to the debtors' account. The language "To be applied to account" was added by Rakers after the contracts were signed and is inconclusive to show an agreement with the debtors.

Since Rakers had no security interest in the debtors' soybeans, any agreement it had with the Bank that it could be "paid first" from grain proceeds if it advanced supplies for the debtors' crops was insufficient to elevate Rakers to the position of a secured creditor. The informal arrangement worked out between Jerry Rakers and the Bank failed to protect Rakers when, due to a decline in the debtors' crop yields, the debtors' soybean proceeds were inadequate to pay both the Bank and Rakers. Rakers used the grain sales contracts as security devices at his peril, as the function of such contracts is to "lock in" a price for grain to be delivered in the future, not to give the buyer an interest in the proceeds of the sale.[3]

In the present case, the evidence is insufficient to show that the debtors agreed to give Rakers the proceeds from sale of their grain, and its position as unsecured creditor is not altered by the agreement it had with the Bank. Because Rakers, as an unsecured creditor, improved its position vis-a-vis other unsecured creditors by offsetting the proceeds from sale of the soybeans against the debtors' account within 90 days of bankruptcy, Rakers has failed to establish an allowable setoff under § 553.

### Ordinary Course of Business

■ Rakers additionally asserts that its application of the soybean proceeds to pay the debtors' account balance was payment in the ordinary course of business as contemplated in 11 U.S.C. § 547(c)(2). This section provides that the trustee may not avoid as a preference the payment of a debt incurred in the ordinary course of business of the debtor and its transferee, so long as the payment was made in the ordinary course of business of both parties and made according to ordinary business terms. Rakers used the procedure of applying proceeds from grain sales contracts to the debtors' account on three other occasions beginning in the fall of 1987.[4] Rakers notes that the debtors did not object on these prior occasions and asserts that its application of soybean proceeds to the debtors' account in November 1988 should not be viewed as an isolated incident.

Jerry Rakers' testimony that he began requiring the debtors to execute grain sales contracts in an effort to ensure payment of the debtors' account belies Rakers' contention that payment was made in the ordinary course of business. Rakers implemented the procedure in question because

---

**3.** While parties to a grain sales contract could conceivably agree that the buyer is to retain the proceeds from sale of the grain, this agreement must be shown conclusively. If Rakers had made such a showing here, the "transfer" of the debtors' property would have occurred when the contracts were executed because it would have been at that time that the debtors relinquished all rights to the grain proceeds.

**4.** The proceeds of a soybean contract signed in September 1987 were applied to the debtors' account in October 1987; proceeds of a wheat contract signed on February 9, 1988, were applied in June 1988; and proceeds of a wheat contract dated July 1, 1988, but unsigned by the parties were applied to the debtors' account on July 8, 1988. Proceeds of two other wheat contracts signed in February and May 1988 were remitted to the debtors and the Bank jointly in July 1988.

he was not being paid as normal at the end of the season when the debtors harvested their crops. Rakers indicated that he used this special payment method with only a few of his customers when he noticed that they were having problems paying their accounts.

The debtors' failure to object when Rakers retained grain proceeds to reduce their account balance does not establish this procedure as an ordinary business practice. The evidence showed that until November 1988, there had been sufficient proceeds to pay both the Bank and Rakers. Indeed, when Rakers received delivery of the debtors' wheat in July 1988, he kept only a part of the proceeds to apply to the debtors' account and remitted the balance to the debtors and the Bank jointly. Thus, Rakers' application of grain proceeds to the debtors' account was not employed on a consistent basis. While Rakers and the Bank may have had an understanding as to when each would be paid out of the debtors' grain proceeds, theirs was obviously a special arrangement not within the ordinary course of business. The Court finds, accordingly, that Rakers has failed to establish an "ordinary course of business" defense to the trustee's preference action.

### Diminution of the Debtors' Estate

Rakers contends finally that the trustee should not be allowed to recover a preference that has not been shown to diminish the debtors' estate to the prejudice of other creditors. The debtors have signed a reaffirmation agreement with the Bank which provides for monthly payments by the debtors on the note secured by the debtors' soybeans. The reaffirmation agreement additionally provides that any proceeds recovered by the trustee from Rakers as a preference and paid to the Bank as a secured creditor holding a lien on the debtors' soybeans will be applied to the indebtedness remaining on the note, and the debtors' monthly payments will be adjusted accordingly. Rakers argues, therefore, that if the trustee is allowed to recover the soybean proceeds from Rakers, the proceeds will be paid over to the Bank and will only benefit the debtors by reducing their payments under the reaffirmation agreement.

 While not an express element of § 547, the requirement that payments to a preferred creditor diminish the bankruptcy estate is a necessary corollary to the objective of preventing favoritism among the debtors' creditors who ought in fairness to stand on the same footing. *See* 4 *Collier on Bankruptcy*, § 547.05, at 547–36 (15th ed.1990); *In re Brent Explorations, Inc.*, 31 B.R. 745 (Bankr.D.Colo.1983). Generally, payments to a fully secured creditor will not be considered preferential because the creditor would not receive more than in a Chapter 7 liquidation. Payments to an unsecured creditor would diminish the estate, however, because the creditor would receive more than it would have under Chapter 7. *Brent Explorations*.

 Rakers, as an unsecured creditor, admittedly received more by reason of its retention of the debtors' soybean proceeds in November 1988 than it would have received in the form of a dividend to unsecured creditors. In arguing that the estate was not diminished because these amounts would go to a secured creditor who is being paid pursuant to a reaffirmation agreement with the debtors, Rakers focuses on postpetition developments that are legally irrelevant to the issue of whether prepetition transfers resulted in diminution of the debtors' bankruptcy case. The analysis of whether a particular transfer is preferential must be determined as of the date of the bankruptcy filing, not at some later unspecified date. *See In re Finn*, 86 B.R. 902 (Bankr.E.D.Mich.1988); *see also Palmer Clay Products v. Brown*, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936): preferential effect of transfer should be determined by the actual effect of the payment as determined when bankruptcy results.

 The Code contains no exception to preference liability that would undermine a preference claim on a debt which the debtor chose to reaffirm postpetition. If Congress had intended to create such an exception, it could have done so explicitly. *Cf.*

11 U.S.C. § 547(c); *Finn.* The practical difficulties arising in the event a debtor rescinded or defaulted on a reaffirmation agreement and the possibilities for abuse if creditors were able to avoid preference liability by obtaining reaffirmation agreements which may not be enforced demonstrate the undesirability of a rule such as that urged by Rakers. *See Finn.* The Court finds that no consideration may be given to the effect of the debtors' reaffirmation agreement in determining whether their estate was diminished by the prepetition transfer to Rakers and, accordingly, rejects Rakers' argument on this point as a defense to the trustee's preference action.

### Conclusion

No issue is presented as to the remaining elements of a preference to be proved by the trustee in this case. It is undisputed that the debtors' obligation for supplies advanced by Rakers arose from March 1988 to October 1988 and so constituted an "antecedent debt owed by the debtor before the transfer was made" for purposes of § 547(b)(2). Rakers' argument that supplies advanced after the May soybean contracts were signed were a "contemporaneous exchange for new value" (11 U.S.C. § 547(c)(1)) is mooted by the Court's finding that the transfer occurred in November rather than May 1988.

For the reasons stated, the Court finds that the trustee may recover the amount of $24,137.62 from Rakers as a preferential transfer under § 547.

IT IS SO ORDERED.