**In re Betty J. INGERSOLL, and Clyde R. Ingersoll, Debtors.**

**Bankruptcy Nos. A–B–87–00391, A–B–87–00011.**

United States Bankruptcy Court, W.D. North Carolina, Asheville Division.

Oct. 29, 1987.

Edward C. Hay, Asheville, N.C., for debtor Betty J. Ingersoll.

David G. Gray, Asheville, N.C., for debtor Clyde R. Ingersoll.

Albert Sneed, Asheville, N.C., for movant Donald Gladieux.

GEORGE R. HODGES, Bankruptcy Judge.

These matters are before the Court on a creditor's motion in each proceeding for relief from the automatic stay to offset pursuant to 11 U.S.C. § 553. The cases were heard on October 22, 1987, at a hearing at which all parties in interest were represented by counsel who presented evidence, briefs and argument. Upon consideration of this matter it is the opinion of the Court that offset is not appropriate in these cases. The Court makes the following findings of fact and conclusions of law:

*Findings of Fact*

1. Clyde Ingersoll is the debtor in a Chapter 11 proceeding filed January 9, 1987. Betty Ingersoll is the debtor in a Chapter 13 proceeding filed August 11, 1987. The debtors are husband and wife.

2. Movant is Donald Gladieux who is a creditor of both Ingersolls. Gladieux is the sole shareholder of a Delaware corporation known as Rosdon Corporation. He formed this corporation a number of years ago in order to obtain the benefits of limited liability in various of his business dealings.

3. Prior to December 31, 1985, the Ingersolls owned and operated a travel agency with three offices in North Carolina and one office in Tennessee. The agency was known as General Travel Agency.

4. In December, 1985, Rosdon bought the business of General Travel Agency's three North Carolina locations. In connection with that, a Purchase Agreement was executed between Clyde Ingersoll, Betty Ingersoll and General Travel Agency as sellers; and Rosdon Corporation, as buyer. Donald Gladieux also executed the Purchase Agreement, as guarantor of performance of Rosdon. The Purchase Agreement provided in pertinent part that:

... Donald C. Gladieux and wife, Rose Marie Gladieux, in the execution of this

instrument for the purpose of guaranteeing performance under this contract by Rosdon Corporation, and for the purpose of consenting to the execution of the Purchase Money Note as Guarantors....

5. Rosdon financed part of the purchase price of the business and in connection therewith Rosdon executed a Promissory Note to the Ingersolls in the amount of $440,700.40. This Promissory Note was executed by Rosdon only. But, the Note contained the following language:

... This note may be offset by any sums due and owing by Clyde R. Ingersoll or wife, Betty J. Ingersoll, or General Travel Agency, to Rosdon Corporation....

Further, Donald Gladieux guaranteed payment of the Note and signed it "Donald C. Gladieux, Guarantor."

6. Gladieux, through his corporate vehicle Rosdon, began operating the three North Carolina locations of General Travel Agency. Betty Ingersoll remained as an employee of General Travel. Clyde Ingersoll continued to operate the Tennessee location of General Travel that Rosdon had not purchased. In fact, General Travel Agency continued to maintain a single "ARC draft account" for both Rosdon's North Carolina offices and the Ingersoll's Tennessee office.

7. The "ARC draft account" is a bank account from which the central clearing agent for airline tickets settles its accounts. The ARC draft account is drafted each Wednesday to pay for tickets issued the previous week. A travel agency must have an ARC draft account to issue airline tickets. As a practical matter, that right is essential to successful operation of a travel agency. Overdrafting the ARC draft account can result in cancellation of an agency's right to issue airline tickets.

8. Rosdon and the Ingersolls deposited money to the ARC draft account to cover their respective liabilities. However, in the last week of June, 1986, the Ingersolls were unable to make a deposit to cover their part of the ARC draft account liability. Clyde Ingersoll asked Gladieux to loan them $22,000.00 to cover their ARC draft account liability due the first week of July, 1986. Gladieux agreed to do this.

9. Gladieux attempted to obtain a loan to Rosdon to cover the Ingersolls' ARC account deficiency, but the bank refused to loan funds to Rosdon. So, Gladieux himself borrowed the money as an individual and deposited it to the General Travel ARC draft account. The Ingersolls executed a Promissory Note payable to Donald Gladieux in the amount of $22,000.00.

10. At the time Gladieux made the $22,000.00 loan to the Ingersolls, Clyde Ingersoll told him that he could offset against Rosdon's note owed to the Ingersolls if the Ingersolls' note was not paid.

11. After these transactions, Clyde Ingersoll filed a Chapter 11 proceeding. After the filing of that proceeding, but before the filing of Betty Ingersoll's Chapter 13, Clyde Ingersoll's attorney sent a letter to Gladieux's attorney which contained the following statement:

... In addition, Mrs. Ingersoll desires me to respond to the March 9, 1987 letter from you and indicate that her response is that Mr. Gladieux should set off necessary payments made on the Gladieux to Ingersoll gives his consent to Gladieux to set off the full payment each month until that $22,000.00 plus interest is paid. This arrangement will also be reflected in Mr. Ingersoll's disclosure statement ...

12. On July 6, 1987, Gladieux obtained a Judgment against Betty Ingersoll on the $22,000.00 note. She filed her Chapter 13 proceeding on August 11, 1987.

### Conclusions of Law

13. Gladieux has moved for relief from the automatic stay and for setoff of the Ingersolls-to-Gladieux debt against the Rosdon-to-Ingersolls debt. Gladieux asserts that these debts are subject to offset pursuant to 11 U.S.C. § 553 on three alternative theories: (a) that there is mutuality between Gladieux as guarantor, and the Ingersolls; (b) that these transactions fall within the § 553 exception for "triangular" mutuality; and (c) that the debts are mutual because Gladieux is the *alter ego* of

Rosdon. The Court concludes that the debts are not "mutual" in the meaning of Section 553 and that no offset should be permitted for the following reasons:

14. Section 553 provides that:

... this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...

Section 553 does not create a right of set-off or define "mutual debt," but merely validates whatever setoff rights that exist under nonbankruptcy law. The North Carolina Supreme Court has recognized a right of offset "only where there is mutuality of the parties." *In Re Battery King Mfg. Co.*, 240 N.C. 586, 589, 83 S.E.2d 490, 492 (1954). Further:

Mutuality is essential to set off.... *"Such right of setoff only exists between the same parties* and in the same right" ... "Where the debts are not due to and from the same persons in the same capacity the right of set-off does not exist."

*In Re Bank of Sampson*, 205 N.C. 333, 335, 171 S.E. 436, 437 (1933). (Citations omitted and emphasis added). These statements are consistent with general statements of the standard: "To be mutual, debts must be in the same right and between the same parties, standing in the same capacity." 4 *Collier on Bankruptcy* 553.04[2] at p. 553–18.

15. The right of offset created by Section 553 must be strictly applied. *See 4 Collier on Bankruptcy* 553.04[2]. That rule is required even in a Court of equity because the effect of a setoff is to prefer one creditor over other creditors of like standing.

■ 16. Applying this standard strictly (and literally), it is clear that these debts are not mutual because they are owed to different parties. *Rosdon* is indebted to the Ingersolls and the Ingersolls are indebted to *Gladieux*. Rosdon and Gladieux are closely related, but they are not the same entity. So, the debts are not mutual and are not subject to offset. This is consistent with other authorities which have found no mutuality in situations involving parent corporations and subsidiaries, sister corporations, and partnerships and individual partners. See *Inland Steel Co. v. Berger*, 327 F.2d 401, 403–04 (7th Cir.1964); *Depositor's Trust Co. v. Frati Enterprises*, 590 F.2d 377, 379 (1st Cir.1979); *In Re Vehm Engineering Corp.*, 521 F.2d 186 (9th Cir.1975); *In Re Bank of Sampson*, 205 N.C. 333, 171 S.E. 436 (1933).

■ 17. Gladieux asserts that the fact that he is the guarantor of Rosdon's debt to the Ingersolls creates the required mutuality. His theory is that his guaranty of payment of this note is an absolute promise that makes him in effect a co-maker. *See*, N.C.Gen.Stat. § 25–3–416 and Comment; *Matter of Johnson*, 552 F.2d 1072 (4th Cir. 1977). *But see, Investment Properties v. Norburn*, 281 N.C. 191, 188 S.E.2d 342 (1972). While that may be the effect of his guaranty, it does not change the fact that the debts are between different parties in different capacities and, thus, not subject to offset.

18. Gladieux also asserts that these transactions constitute "triangular" mutuality. Such a situation can exist where a debtor has formally agreed that two entities may aggregate debts owed to and from the debtor for offset purposes. *Bloor v. Shapiro*, 32 B.R. 993, 1001–02 (S.D.N.Y. 1983); 4 *Collier on Bankruptcy* 553.04[2] at p. 553–19. That situation does not exist here because the only formal agreement is that Rosdon's note may be offset by any sums the Ingersolls owe *Rosdon*—not debts they owe Gladieux.

19. Any comments Clyde Ingersoll may have made regarding Gladieux's right to set off Rosdon's debt do not constitute a contractual right for offset. Those statements lack the formality of a binding contract and amount at most to a statement of opinion. The same is true of the statements in Mrs. Ingersoll's counsel's letter. Those statements appear related to settlement negotiations and not proper for consideration. In any event, the statements

172

do not appear intended to be binding on the parties and certainly are not binding on the Court.

■ 20. Finally, Gladieux asserts that Rosdon is his *alter ego* so that he and Rosdon should be considered the same entity for determining mutuality. In *Board of Transportation v. Martin*, 296 N.C. 20, 249 S.E.2d 390 (1978), the Court held that where individuals have deliberately adopted the corporate form in order to secure its advantages, they cannot disregard the existence of the corporation where it is to their benefit to do so. That is the case here. Gladieux formed Rosdon in order to obtain the benefit of limited liability. He cannot now disregard the existence of the separate corporate entity simply because it would be to his advantage to do so. A corporation is an entity distinct from its shareholders—whether the shareholders are another corporation, a group of individuals or a single individual. *Troy Lumber Co. v. Hunt*, 251 N.C. 624, 112 S.E.2d 132 (1960); *Huski–Bilt, Inc. v. Trust Co.*, 271 N.C. 662, 157 S.E.2d 352 (1967). Consequently, Rosdon and Gladieux should not be considered the same entity for determining mutuality.

21. In conclusion, it should be noted that the right of offset recognized in Section 553 is a narrow exception to fundamental principles of the Bankruptcy Code which prohibit preferential treatment and discriminatory treatment of creditors of like status. Consequently, the exception should be applied strictly and narrowly. When Section 553 is applied in that manner on these facts, the Court concludes that mutuality is lacking and no offset should be permitted. Having reached that conclusion it is hereby ORDERED that Donald Gladieux's motion is denied.