**In re PHOTO MECHANICAL SERVICES, INC., Dessein Amerique, Inc., and Photo Mechanix, Inc., Debtors.**

**PHOTO MECHANICAL SERVICES, INC., Plaintiff,**

v.

**E.I. DUPONT DE NEMOURS & COMPANY, INC., Defendant.**

Bankruptcy No. 4–93–5268.
Adv. No. 4–94–295.

United States Bankruptcy Court,
D. Minnesota.

March 15, 1995.

---

Thomas J. Flynn, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, MN, for plaintiff.

Phillip Bohl, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, MN, Wayne Walker, DuPont Legal Div., Wilmington, DE, for defendant.

*MEMORANDUM ORDER GRANTING PARTIAL SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned on the 3rd

day of November, 1994, on cross motions for summary judgment. Appearances were as follows: Thomas Flynn for the plaintiff, Photo Mechanical Services, Inc. ("Debtor"); and Phillip Bohl and Wayne Walker for the defendant, E.I. DuPont De Nemours & Company, Inc. ("DuPont").

Based on the arguments of counsel, and the files, records and proceedings herein, I conclude that Debtor's motion for summary judgment should be granted, in part, and DuPont's motion for summary judgment should be denied.

## UNDISPUTED FACTS

1. Debtor and its affiliates[1] filed a petition for relief under Chapter 11 of the Bankruptcy Code on September 13, 1993 ("petition date"). Debtor's Chapter 11 plan was confirmed on September 22, 1994.

2. Debtor is in the printing pre-press business.

3. DuPont's Electronic and Chemical Imaging Division manufactures and distributes equipment and products used in the printing pre-press industry.

### A. The Rebate Agreement

4. In April, 1991, Debtor and DuPont entered into a partnership agreement as an incentive for Debtor to purchase products from DuPont ("Rebate Agreement"). The Rebate Agreement consists of three parts. Part I provides a buyer's monthly discount in the amount of 17% to be provided to Debtor at the point of purchase. Part II provides a preferred position for Debtor in receiving information regarding the application of developments in electronic imaging to the printing industry. Part III provides a rebate to Debtor based on the cumulative amount of purchases of DuPont products made during a three-year period from May 1, 1991 through May 1, 1994 ("the rebate period"). Part III

is the subject of the current motions for summary judgment.

5. The rebate set forth in Part III of the Rebate Agreement is based on the following formula:

| Total purchases | Rebate |
| --- | --- |
| $1.5 MM to $2.49 MM | 3% |
| $2.5 MM to $3.49 MM | 6% |
| $3.5 MM and above | 8% |

6. The Rebate Agreement does not require Debtor to purchase the DuPont products from any single distributor. However, during the rebate period, Debtor purchased substantially all the DuPont products from DuPont's local distributor, Olson Graphics Products, Inc., ("Olson").[2]

7. During the rebate period, Debtor ordered and received $2,872,138.38[3] worth of DuPont products from Olson. Of this amount, $97,778.33 remains unpaid. Debtor insists it is entitled to a rebate for all purchases from Olson totalling $2,872,138.38— which results in a six percent (6%) rebate in the amount of $172,328.30. DuPont has not turned over the rebate proceeds to Debtor.

### B. The DuPont/Olson Agreement

8. By Letter Agreement dated September 17, 1991, DuPont and Olson agreed to support the Rebate Agreement between DuPont and Debtor ("DuPont/Olson Agreement"). Pursuant to the DuPont/Olson Agreement, DuPont granted extended credit terms to Olson for the purchase of $220,000 worth of goods from DuPont for resale to Debtor. It provides, in part:

> DuPont has obtained a commitment from PMSI to purchase certain DuPont Graphic Arts and Proofing Consumable products, which we believe will benefit Olson Graphics as well as DuPont. *As part of the transaction,* DuPont agreed to provide extended credit terms with respect to certain purchases to Olson Graphics, with the un-

---

1. By Order dated September 28, 1993, I directed that the three bankruptcy cases be jointly administered.

2. Debtor only seeks the rebate from DuPont for purchases made from Olson.

3. This amount includes products received both prepetition and postpetition. Debtor has paid for all products purchased postpetition as an administrative expense. While DuPont argues that this amount is disputed to the extent it remains subject to verification, it allows this amount to be taken as undisputed for purposes of the summary judgment motions.

derstanding that similar extended credit terms would be provided by Olson Graphics to PMSI.

(Emphasis added).

9. The DuPont/Olson Agreement also states that, in the event of Debtor's insolvency and Debtor's failure to pay Olson for its purchases, DuPont would forgive Olson's obligation to pay DuPont to the same extent Debtor failed to pay Olson. Specifically, it provides:

> As a Dupont dealer, ·Olson Graphics normally has the obligation to collect and bear full risk for receivables owed by end user purchasers of DuPont products. However, in this particular instance, with regard to extended term purchases ... DuPont agrees that, as long as Olson Graphics takes all reasonable steps to collect the obligation from PMSI, if due to insolvency PMSI fails to pay Olson Graphics with respect to such purchase, DuPont shall forgive the obligation to repay DuPont with respect to extended term purchases....

### C. The Extended Term Agreement

10. As contemplated by the DuPont/Olson Agreement, Olson did extend Debtor identical credit terms pursuant to an agreement dated September 26, 1991 ("Extended Term Agreement"). Under the Extended Term Agreement, Debtor agreed that DuPont's 17% Buyer Discount (as set forth in Part I of the Rebate Agreement) would be paid directly to Olson as partial repayment of Olson's extension of credit to Debtor. Debtor would then pay the remaining balance in cash. Essentially, under the terms of the Extended Term Agreement, Olson provided Debtor with financing of $220,000 for the purchase of DuPont products, payable over three years.

11. On the petition date, Debtor was indebted to Olson in the amount of $97,778.33 [4] for products received but not yet paid for pursuant to the Extended Term Agreement. Since Debtor had not paid Olson for those products, Olson also owed DuPont $97,778.33 under the terms of the DuPont/Olson Agreement.

12. Subsequently, DuPont forgave the $97,778.33 owed by Olson in accordance with the DuPont/Olson Agreement. On November 15, 1993, Olson assigned the forgiven portion of its claim against Debtor in favor of DuPont in the amount of $97,778.33 ("assignment of Olson's claim").

### D. The Lease Agreement

13. In January, 1991, Dupont Imaging Systems Inc. prepared a business proposal for Debtor's use of a Crosfield Studio 9500 Color Studio System ("Equipment"). On April 25, 1991, Debtor and DuPont entered into an Agreement of System License and Sale in which DuPont agreed to sell the Equipment.

14. On July 29, 1991, Debtor entered into a Master Lease Agreement ("Lease Agreement") with Tokai Financial Services ("Tokai") for the lease of the Equipment. The monthly rental rate was $10,151 plus sales tax in the amount of $710.57. The lease was effective September 18, 1991.

15. As reflected in the Purchase Order dated August 15, 1991 ("Purchase Order"), Tokai purchased from DuPont the Equipment for shipment directly to the Debtor. The Purchase Order states that it "is conditional upon receiving the vendor repurchase agreement from DuPont."

### E. The Repurchase Agreement

16. Approximately one month later, in mid-September of 1991, DuPont and Tokai entered into a Vendor Recourse, Guaranty and Repurchase Agreement ("Repurchase Agreement") which provides in pertinent part:

> For and in consideration of the making of the above described [Lease Agreement], at the request of [DuPont] and in reliance on this Guaranty, [DuPont] as a direct and primary obligation, *absolutely and uncon-*

---

**4.** Olson actually has filed a prepetition unsecured claim against Debtor in the amount of $395,-409.12. Of this amount, $97,778.33 relates to the Extended Term Agreement, and $297,630.75 relates to prepetition unpaid invoices for products manufactured by other distributors. By Order dated November 28, 1994, I allowed Olson's claim in the amount of $302,263.48.

*ditionally guarantees* to [Tokai] ... the prompt payment of all rent ... to be paid, any other sums which become due and owing under such Lease and at least [Tokai's] booked residual value of the above described equipment at the end of the Lease term which shall equal fifteen percent of the original Equipment cost.

In the event of any default ... [DuPont] shall have the option to either make all required Lease payments ... or repurchase the Equipment for the purchase price set forth on [a stipulated loss value schedule].

\* \* \* \* \* \*

Upon receipt of the required repayment sum, [Tokai] will assign the Lease and the Equipment to [DuPont] and upon payment of the purchase amount at the end of the lease term, [Tokai] will transfer title to the equipment to [DuPont].

(Emphasis added). The Repurchase Agreement states that it shall be governed by the laws of the Commonwealth of Pennsylvania.

17. Following the petition date, Debtor determined it did not need the Equipment for operation of its business. Accordingly, Debtor rejected the Lease Agreement effective October 1, 1993, and the Court approved the rejection by order dated November 17, 1993.

18. By letter dated September 30, 1993, Tokai made a demand on DuPont to perform its obligations under the Repurchase Agreement: either pay the amount due under the Lease, or repurchase the Equipment and Lease. Since Debtor had rejected the Lease, DuPont repurchased the Equipment and Lease from Tokai at the stipulated loss value in the amount of $415,332.30. According to the terms of the Repurchase Agreement, upon payment Tokai was to transfer title of the Equipment and assign the Lease to DuPont.

19. On November 1, 1993, Tokai filed a proof of claim asserting an unsecured nonpriority claim in the amount of $574,704.25 for unpaid prepetition lease payments and rejection damages pursuant to § 365(g) of the Code. Debtor objected to the claim, arguing that allowance of the claim would expose Debtor to double damages. By Order dated November 23, 1994, this Court disallowed Tokai's claim.

## F. *DuPont's Proof of Claim*

20. On March 28, 1994, DuPont filed an amended proof of claim in the amount of $458,948.33. DuPont cited three bases for the claim, which reads as follows:

| | |
|---|---:|
| Amount paid by DuPont to Tokai Financial Services for repurchase of rejected lease for DuPont Studio 9500; Contract No. 24 03 5701 | $415,332.30 |
| Amount due to DuPont for Assignment of Claim of Olson Graphic Products, Inc. | $ 97,778.33 |
| Amount due DuPont for service | $ 387.70 |
| TOTAL DUE TO DUPONT: | $513,498.33 |
| Less credit for return of DuPont Studio 9500 Equipment Inventory Value | $ 54,550.00 |
| **AMENDED TOTAL DUE TO DUPONT:** | **$458,948.33** |

21. The first part of DuPont's claim in the amount of $415,332.30 refers to the amount DuPont paid to Tokai pursuant to the Repurchase Agreement. This portion of the claim is the subject of DuPont's motion for summary judgment for setoff.

22. The second part of DuPont's claim in the amount of $97,778.33 refers to the amount Debtor owed Olson for unpaid DuPont products, and that DuPont acquired a right to as a result of the assignment of Olson's claim. This portion of the claim is the subject of DuPont's recoupment defense to Debtor's motion for summary judgment.

23. The third part of DuPont's claim in the amount of $387.70 refers to prepetition services performed by DuPont for the service and maintenance of DuPont equipment in the Debtor's possession. Debtor has not paid for these services. Both parties agree that DuPont is entitled to set off this amount against any amounts due Debtor under the Rebate Agreement.

24. By Order dated November 23, 1994, I postponed the determination of allowance of DuPont's claim pending the final adjudication of this adversary proceeding.

### G. Procedural History

25. On May 9, 1994, Debtor filed its Summons and Complaint against DuPont asserting that it was entitled to a rebate pursuant to the Rebate Agreement in the amount of $172,328.30, plus interest. Debtor asserts the following bases for recovery of the rebate: (1) turnover of property of the estate pursuant to § 542; (2) general damages arising from the breach of the Rebate Agreement; and (3) payment pursuant to the terms of the Rebate Agreement based on the termination of the rebate program.

26. In its Answer, DuPont admits the existence of the Rebate Agreement, but denies owing any net amount to Debtor based on the defenses of setoff, recoupment and equitable estoppel.

27. On November 3, 1994, I heard the arguments on the parties' cross-motions for summary judgment. Debtor contends, in its motion for summary judgment, that it is entitled to turnover of the rebate under the Rebate Agreement in the amount of $172,-328.30. In response, DuPont asserts that material issues of fact exist as to the rebate amount, and further asserts it is entitled to recoup $97,778.33 representing amounts owing to Olson and later assigned to DuPont. DuPont asserts, in its motion for summary judgment, it is entitled to set off $415,332.30 against any amount due to Debtor, and is entitled to adequate protection of the setoff rights.

### APPLICABLE LAW

#### A. Standards for Summary Judgment

Summary judgment is governed by Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056. Federal Rule 56 provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party on summary judgment bears the initial burden of showing that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the moving party is the plaintiff, it carries the additional burden of presenting evidence that establishes all elements of the claim. United Mortgage Corp. v. Mathern (In re Mathern), 137 B.R. 311, 314 (Bankr. D.Minn.1992), aff'd, 141 B.R. 667 (D.Minn. 1992). The burden then shifts to the non-moving party to produce evidence that would support a finding in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). This responsive evidence must be probative, and must "do more than simply show that there is some metaphysical doubt as to the material fact." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In weighing the evidence, the court may address whether the respondent's theory on the facts is "implausible." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1480 (6th Cir.1989). The court may also gauge the reasonableness of competing inferences asserted on the same basic evidence. Barnes v. Arden Mayfair, Inc., 759 F.2d 676, 681 (9th Cir.1985); Mathern, 137 B.R. at 322. The reasonableness of asserted inferences is measured against the viability of the legal theory which they are asserted to support, and is also controlled by the weight and probity of the evidence advanced to support them. Mathern, 137 B.R. at 322–23. The ultimate question is whether reasonable minds could differ as to the factual interpretation of the evidence of record. Id. at 323 (citing Liberty Lobby, 477 U.S. at 250–52, 106 S.Ct. at 2511–12). Thus, in some instances, a court may rely on inferences to grant a motion for summary judgment, even where subjective intent is an issue. Id. at 322.

#### B. Debtor's Motion for Summary Judgment

Debtor argues that it is entitled to summary judgment in the amount of $172,320.38 based on the terms of the Rebate Agreement since it purchased $2,872,138.38 worth of Du-

Pont products. In response, DuPont raises two defenses. First, it argues that a material issue of fact exists as to the term "purchase" as used in the Rebate Agreement, which thereby affects the amount of the rebate due. Second, DuPont argues that it is entitled to recoup the amounts due it under the assignment of Olson's claim against any amounts due to Debtor.

### 1. Entitlement to the rebate under the Rebate Agreement

Clearly, Debtor has met its burden of proving it is entitled to a rebate for DuPont products it purchased from Olson. The language of the Rebate Agreement is unambiguous. The only issue, therefore, is the amount of the rebate. Resolution of this issue hinges on the meaning of the term "purchase."

### 2. Definition of "purchase"

■ The burden is on DuPont to establish that a material issue of facts exists to preclude summary judgment. DuPont argues that a material issue of fact exists as to the term "purchase" as used in the Rebate Agreement. Specifically, DuPont argues that the rebate Debtor is seeking is based on the goods *received* with a value of $2,872,138.38, but of this amount, Debtor has not *paid* for $97,778.33 worth of products. In support, DuPont submits the affidavit of Jennifer Gale ("Gale"), the Credit Account Manager for DuPont when the Rebate Agreement was negotiated. According to the affidavit, Gale's understanding of the word "purchase" as used in the Rebate Agreement refers only to "goods delivered to PMSI for which DuPont has received payment." Gale insists that the Rebate Agreement was "not intended to obligate DuPont to pay a cash rebate for goods for which DuPont has not been paid."

DuPont has met its· burden based on the ambiguous language of the Rebate Agreement (which fails to define "purchase"), coupled with the Gale affidavit. It is certainly not unreasonable that the term "purchase" means "products actually paid for" by Debtor. While it is commonplace to purchase goods and services on terms, it is also plausible in this situation that DuPont would be unwilling to offer a rebate on goods for which it has yet to receive payment. Therefore, a material issue of fact exists as to the meaning of the Rebate Agreement.

■ Nonetheless, it is undisputed that Debtor *paid for* $2,774,360 [5] worth of DuPont products during the rebate period. Pursuant to the Rebate Agreement, purchases totalling between $2.5 million and $4.39 million are entitled to a rebate of six percent (6%). Six percent of $2,774,360 equals $166,461.60. Accordingly, Debtor is entitled to judgment in that amount. The only triable issue, therefore, is whether Debtor is entitled to a rebate on the remaining $97,778.33. This requires a determination of the meaning of the term "purchase" in the Rebate Agreement.

### 3. Recoupment

DuPont also argues that it is entitled to recoup $97,778.33 due from the assignment of Olson's claim against the amount due to Debtor under the Rebate Agreement. Resolution of this issue is a question of law.

#### a. Recoupment standards

■ The equitable doctrine of recoupment is "[t]he setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action strictly for the purpose of abatement or reduction of such claim. ...." *In re Drexel Burnham Lambert Group, Inc.,* 113 B.R. 830, 853 (Bankr. S.D.N.Y.1990) (citing 4 Lawrence P. King, Collier on Bankruptcy, ¶ 553.03, at 553–13 (15 ed. 1989)). Unlike setoff which is explicitly provided for in the Code and generally involves mutual debts arising from *different* transactions, recoupment is the setting up of a demand arising from the *same* transaction as the plaintiff's claim. While setoff, in effect, elevates an unsecured claim to a secured status, recoupment allows the creditor to assert that certain mutual claims extinguish one another. *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir.1984).

The justification for the recoupment doctrine is that where the creditor's claim

---

**5.** This calculation is based on the total amount of products ordered and received during the rebate period in the amount of $2,872.138.38. *See* ¶ 7. Of this amount, $97,778.33 remains unpaid.

against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable.

*Id.* at 875 (citations omitted).

■ The typical situation in which recoupment is invoked involves a credit and debt arising out of a transaction for the sale of goods or services. Specifically, creditors may recoup a claim for prepetition overpayment of advances or overestimates against a debtor's postpetition claim under the same contract. *See, e.g., Ashland Petroleum Co. v. Appel (In re B & L Oil Co.),* 782 F.2d 155, 158–59 (10th Cir.1986); *Centergas, Inc. v. Conoco, Inc. (In re Centergas, Inc.),* 172 B.R. 844, 848 (Bankr.N.D.Tex.1994); *In re Consumer Health Servs. of America, Inc.,* 171 B.R. 917, 922 (Bankr.D.D.C.1994). *See also In re Vaughter,* 109 B.R. 229, 233–34 (Bankr. W.D.Tex.1989) (discussing specific cases where recoupment is and is not appropriate).

■ Based on the foregoing, a defendant may be entitled to recoupment if two elements are satisfied. *First,* both the claims arise from a single contract or transaction. *United States v. Dewey Freight Sys., Inc.,* 31 F.3d 620, 623 (8th Cir.1994); *Solow v. Greater Orlando Aviation Auth. (In re Midway Airlines, Inc.),* 175 B.R. 239, 246 (Bankr.N.D.Ill.1994); *In re American Sunlake Ltd. Partnership,* 109 B.R. 727, 730 (Bankr.W.D.Mich.1989). *Second,* some type of overpayment must exist, whether the overpayment was accidentally or contractually made. *Solow,* 175 B.R. at 246; *Centergas,* 172 B.R. at 848; *In re Public Serv. Co. of New Hampshire,* 107 B.R. 441, 445 (Bankr. D.N.H.1989). Recoupment is narrowly construed. *Dewey Freight,* 31 F.3d at 623; *Electronic Metal Prods., Inc. v. Honeywell, Inc.,* 95 B.R. 768, 770 (D.Colo.1989); *Public Service,* 107 B.R. at 444.

### b. *Same contract or transaction*

■ The first requirement, that the claims arise from the same contract or transaction, has been rarely defined. "[C]ourts have refrained from precisely defining the same-transaction standard, focusing instead on the facts and the equities of each case." *Dewey Freight,* 31 F.3d at 623. The fact that a contract exists between the parties does not automatically enable the creditor to avail itself of recoupment. *University Medical Ctr. v. Sullivan (In re University Medical Ctr.),* 973 F.2d 1065, 1080 (3d Cir.1992). Moreover, the fact that the same two parties are involved, and that a similar subject matter gave rise to both claims does not mean that the two arose from "the same transaction." *Lee v. Schweiker,* 739 F.2d at 875. "[B]oth debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of the transaction without also meeting its obligation." *Dewey Freight,* 31 F.3d at 623 (citing *University Medical Center,* 973 F.2d at 1081).

■ In the present case, DuPont admits that its right to payment does not arise from the same contract. Instead, it alleges that the following series of contracts comprise the same transaction:

(1) Debtor and DuPont entered into the Rebate Agreement as an incentive;

(2) In support of the Rebate Agreement, DuPont entered into its own negotiations with Olson regarding credit terms. This resulted in the DuPont/Olson Agreement;

(3) Pursuant to the DuPont/Olson Agreement, if Debtor failed to repay Olson, DuPont agreed to forgive the debt owing it from Olson;

(4) Olson extended credit terms to Debtor under the extended Term Agreement;

(5) Olson delivered goods to Debtor; and

(6) Debtor failed to pay Olson, thereby invoking the DuPont/Olson Agreement.

This transaction contemplated by DuPont is not the type of transaction within the narrow doctrine of recoupment. In essence, DuPont is attempting to connect itself to Debtor via the DuPont/Olson Agreement. The fact that the Agreement uses the phrase "as part of the transaction" is irrelevant. In reality, the Rebate Agreement and the DuPont/Olson Agreement involve two very sep-

arate transactions: one between DuPont and the Debtor; the other between DuPont and Olson. In fact, Debtor was not even required to purchase DuPont products from Olson to receive the rebate.

Moreover, DuPont is attempting to recoup a debt that Debtor owes to Olson. The only connection between Debtor's debt to Olson and its debt to DuPont is the assignment of the Olson claim. This Court is unaware of any reported decision that has extended the "same transaction" theory to include an assignment of a claim. Accordingly, DuPont's claim against Debtor did not arise from the same transaction.

### c. Overpayment

■ Debtor has also failed to establish that some type of overpayment exists.[6] The rationale is that to prevent recoupment would result in a windfall to the debtor. See B & L Oil, 782 F.2d at 159; Centergas, 172 B.R. at 849. Oftentimes, this overpayment is in the form of advance payments. For example, in In re Public Service Co. of New Hampshire, 107 B.R. 441, 445 (Bankr.D.N.H. 1989), the court held that the customer's deposits given to the utility were designed to be returned to the customer, and were therefore an overpayment. Similarly, in Mohawk Industries, Inc. v. United States (In re Mohawk Industries), 82 B.R. 174, 177 (Bankr. D.Mass.1987), a creditor was entitled to deduct the advance prepetition payments against the value of goods subsequently delivered.

Here, DuPont has made no overpayment to Debtor. Debtor simply purchased goods on terms and failed to pay Olson for the products prior to the petition date. Now, DuPont is seeking repayment of Debtor's unpaid bills and Olson's unpaid invoices. This is the very situation trade creditors confront in bankruptcy, which entitles them to a general unsecured claim. While DuPont may assert an unsecured claim against Debtor (as Olson would have had), it is not entitled to recoupment. See Westinghouse Elec. Corp. v. Fidelity & Deposit Co., 63 B.R. 18, 21–22 (E.D.Pa.1986) (disallowing recoupment of unpaid bills); Fischer v. Outlet Co. (In re Denby Stores, Inc.), 86 B.R. 768, 782–83 (Bankr.S.D.N.Y.1988) (disallowing recoupment where no overpayment exists).

In conclusion, Debtor is entitled to partial summary judgment awarding it a rebate for DuPont products actually paid for during the rebate period in the amount of $166,461.60. The only triable issue, therefore, is whether Debtor is also entitled to a rebate for products it has received but not paid for. Whatever the final result, DuPont is not entitled to recoup $97,778.33 against the Debtor's rebate.

### C. DuPont's Motion for Summary Judgment

DuPont seeks summary judgment on the basis that it may set off its claim against Debtor in the amount of $415,332.30, representing the amount paid to Tokai under the Repurchase Agreement, against the amount due Debtor under the Rebate Agreement.[7]

### 1. Setoff Standards

Section 553 of the Code governs setoff. It provides, in part:

6. Not all cases explicitly state that overpayment is an element of recoupment. Yet, as some cases point out, most courts permitting recoupment do so when an overpayment exists. See, e.g., Ashland Petroleum Co. v. Appel (In re B & L Oil Co.), 782 F.2d 155, 158–59 (10th Cir.1986) (deciding that creditor properly recouped overpayments for oil); Security Pac. Nat'l Bank v. Enstar Petroleum Co. (In re Buttes Resources Co.), 89 B.R. 613, 616 (S.D.Tex.1988) (allowing recoupment of advanced production costs from postpetition proceeds); United States v. Midwest Serv. & Supply Co. (In re Midwest Serv. & Supply Co.), 44 B.R. 262, 265 (D.Utah 1983) (allowing recoupment of progress payments in excess of the work performed); Waldschmidt v. CBS, Inc., 14 B.R. 309, 314 (M.D.Tenn.1981) (allowing a recording com-

pany that paid advance royalties to a musician to recoup the advances from postpetition record sales); In re Ruiz, 146 B.R. 877, 880 (Bankr. S.D.Fla.1992) (allowing recoupment of advance commissions); Fiero Prod., Inc. v. Conoco, Inc. (In re Fiero Prod. Inc.), 102 B.R. 581, 586 (Bankr. W.D.Tex.1989) (allowing recoupment of overpayments); In re Yonkers Hamilton Sanitarium, Inc., 22 B.R. 427, 433 (Bankr.S.D.N.Y.1982), aff'd, 34 B.R. 385 (S.D.N.Y.1983) (allowing recoupment of Medicare expenses).

7. DuPont also seeks to set off $387.70 for prepetition services. Both parties agree that DuPont is entitled to set off this amount.

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case except to the extent that—

(1) the claim of such creditor against the debtor is disallowed;

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case. . . .

11 U.S.C. § 553(a).

■ The language of § 553 does not create a right of setoff where none exists. Rather, it recognizes the existence of the doctrine under applicable nonbankruptcy law, and provides for further restrictions. Therefore, prior to considering setoff under § 553, the parties must be entitled to setoff under applicable nonbankruptcy law. *Alexander & Jones v. Sovran Bank (In re Nat Warren Contracting Co.)*, 905 F.2d 716, 718–19 (4th Cir.1990); *Lopez Stubbe v. Rua (In re Colonial Mortgage Bankers Corp.)*, 128 B.R. 21, 24 (D.Puerto Rico 1991), *aff'd*, 971 F.2d 744 (1st Cir.1992); *United States v. Maxwell (In re Pyramid Indus., Inc.)*, 170 B.R. 974, 981 (Bankr.N.D.Ill.1994); *Karnes v. Rakers Elevator, Inc. (In re Woker)*, 120 B.R. 454, 458–59 (Bankr.S.D.Ill.1990); *In re Drexel Burnham Lambert Group, Inc.*, 113 B.R. 830, 839 (Bankr.S.D.N.Y.1990); 4 Lawrence P. King, *Collier on Bankruptcy*, ¶ 553.02, at 553–10 (15th ed. 1994); 1 David G. Epstein et al., *Bankruptcy*, § 6–40, at 666–68 (1992).

■ If setoff is available under nonbankruptcy law, the next inquiry is whether setoff is available under § 553 of the Code, which requires that: (1) the creditor owes a debt to the debtor arising prepetition; (2) the creditor has a claim against the debtor arising

prepetition; and (3) both the debt and the claim are mutual obligations. 11 U.S.C. § 553(a); *United States v. Gerth*, 991 F.2d 1428, 1431 (8th Cir.1993).

■ "For setoff purposes, a debt arises when all transactions necessary for liability occur, regardless of whether the claim was contingent, unliquidated, or unmatured when the petition was filed." *Gerth*, 991 F.2d at 1433 (citing *Braniff Airways, Inc. v. Exxon Co. U.S.A.*, 814 F.2d 1030, 1036 (5th Cir. 1987)). For the obligation to pay to arise prepetition, the debt must be absolutely owed prepetition. *Id.* Dependency on a postpetition event, however, does not prevent a debt from arising prepetition. *Id.; Greseth v. Federal Land Bank (In re Greseth)*, 78 B.R. 936, 941–42 (D.Minn.1987); *Moratzka v. United States (In re Matthieson)*, 63 B.R. 56, 59 (D.Minn.1986); *In re Affiliated Food Stores, Inc.*, 123 B.R. 747, 748 (Bankr. N.D.Tex.1991). "The key is whether the genesis of each debt was prepetition, that is, whether the events giving rise to the debt occurred before bankruptcy." Epstein, § 6–40, at 671 (citing *Braniff Airways*, 814 F.2d at 1036).

■ Mutuality requires that something be "owed" by both sides. To be mutual, the court must find that: (1) the debts are in the same right; (2) the debts are between the same parties; and (3) the parties stand in the same capacity. *Kitaeff v. Vappi & Co. (In re Bay State York Co.)*, 140 B.R. 608, 614 (Bankr.D.Mass.1992); 4 King, ¶ 553.04[2], at 553.22. Thus, triangular setoffs are generally not permitted. *Sherman v. First City Bank (In re United Sciences of America, Inc.)*, 893 F.2d 720, 723 (5th Cir.1990); *Pyramid Indus.*, 170 B.R. at 982; *Virginia Block Co. v. Bushong (In re Virginia Block Co.)*, 16 B.R. 560, 562 (Bankr.W.D.Va.1981). The mutuality requirement is strictly construed. *Wooten v. Vicksburg Refining, Inc. (In re Hill Petroleum Co.)*, 95 B.R. 404, 411 (Bankr. W.D.La.1988); 4 King, ¶ 553.04[1], at 553–20.[8]

---

8. One court stated:

As Congress recognized, setoffs work against both the goal of orderly reorganization and the fairness principle because they preserve seren-

dipitous advantages accruing to creditors who happen to hold mutual obligations, thus disfavoring other equally-deserving creditors and interrupting the debtor's cash flow. Conse-

A creditor asserting setoff has the burden of establishing that all of the above requirements have been met. *Metco Mining & Minerals, Inc. v. PBS Coals, Inc. (In re Metco Mining & Minerals, Inc.)*, 171 B.R. 210, 216 (Bankr.W.D.Pa.1994). The right to setoff under § 553 is permissive, not mandatory. Therefore, its application rests within the discretion of the court and general principles of equity. *In re Bevill, Bresler & Shulman Asset Management*, 896 F.2d 54, 57 (3d Cir.1990); 4 *Collier on Bankruptcy*, ¶ 553.02, at 553–13. "[A] bankruptcy court may disallow an otherwise proper § 553 setoff if there are compelling reasons for not allowing such a preference." *Bird v. Carl's Grocery Co., Inc. (In re NWFX, Inc.)*, 864 F.2d 593, 595 (8th Cir.1989).

### 2. Analysis

The parties do not dispute that Debtor's claim against DuPont for the rebate is a prepetition claim.[9] The parties do disagree as to whether DuPont's claim arises prepetition and whether mutuality exists between the parties. The root of this disagreement stems from the fact that the parties disagree as to the nature of the Repurchase Agreement which serves as the basis of DuPont's claim against Debtor. This is a very critical distinction for purposes of setoff.

DuPont argues that its claim against Debtor is one of two things. First, DuPont insists that the Repurchase Agreement is a guaranty, and as a result, it is entitled to a claim for reimbursement arising from the repurchase of the equipment from Tokai. Second, Du-Pont insists that, by reason of its payment to Tokai, it is entitled to a subrogation claim under § 509(a) of the Code.

The Debtor vehemently opposes DuPont's characterization of its claim. It characterizes the Repurchase Agreement as a side agreement between Tokai and DuPont.[10] According to Debtor, the Repurchase Agreement is not a guaranty, it is rather a postpetition transfer of a claim which is expressly barred from setoff under § 553(a)(2)(A).

The nature of the Repurchase Agreement and DuPont's claim is crucial to the outcome of this case. If DuPont's claim is a claim for reimbursement, regardless of whether the guaranty was called postpetition, it is deemed a prepetition claim against the Debtor for purposes of setoff. *See* 11 U.S.C. § 502(e)(2); *Drexel Burnham*, 113 B.R. at 840 n. 12; *Fischer v. Outlet Co. (In re Denby Stores, Inc.)*, 86 B.R. 768, 778 n. 9 (Bankr. S.D.N.Y.1988). Similarly, subrogation claims are deemed to be prepetition claims. *Stephenson v. Salisbury (In re Corland Corp.)*, 967 F.2d 1069, 1078 (5th Cir.1992); *Denby Stores*, 86 B.R. at 778. Further, when an entity acting as a surety or guarantor for the debtor has a claim for reimbursement based on payment to another creditor, or when the creditor has a claim for subrogation, mutuality is evident. This is because such claim and the debtor's debt are owing between the same parties. This rule works an exception to the general prohibition against triangular setoffs. *Corland Corp.*, 967 F.2d at 1077; *Sherman v. First City Bank*, 99 B.R. 333,

---

quently, the circle of creditors entitled to exercise setoff rights in bankruptcy is tightly circumscribed.

*Public Serv. Co. of New Hampshire v. New Hampshire Elec. Coop. (In re Public Serv. Co. of New Hampshire)*, 884 F.2d 11, 13 (1st Cir.1989) (citations omitted).

9. Debtor's right to payment arose when the Rebate Agreement was signed and DuPont promised to pay Debtor a rebate for all purchases made during the rebate period. It is irrelevant whether the rebate period ended postpetition. Under *Gerth*, DuPont was absolutely liable for the rebate the moment it agreed to pay the rebate. The claim, however, was contingent upon Debtor purchasing the DuPont products, was unliquidated in the sense that the claim could not be measured until the end of rebate period, and

was unmatured since the claim could not mature until the end of the three year period.

10. Debtor places much emphasis on the fact that DuPont and Tokai entered into the Agreement without the knowledge of the Debtor. Debtor submits the affidavit of Robert Rice, the Treasurer of Debtor prior to the liquidation, and the affidavit of Joan Listberger, President of Debtor. Both affiants state that they participated in the negotiations of all the pertinent contracts, Tokai did not require a guarantor of Debtor's Lease obligations, and that all agreements were negotiated independently. As discussed more fully *infra*, it is irrelevant whether a the principal has knowledge of a guaranty for a guaranty to be effective. *See* Restatement of the Law, *Security*, § 82, comment f (1941).

336 (N.D.Tex.1989), *aff'd,* 893 F.2d 720 (5th Cir.1990); *Denby Stores,* 86 B.R. at 780–81; *In re Flanagan Bros. Inc.,* 47 B.R. 299, 302–03 (Bankr.D.N.J.1985); 1 Epstein, § 6–40, at 680. *But see In re Ingersoll,* 90 B.R. 168, 171 (Bankr.W.D.N.C.1987) (holding that a guaranty does not change the fact that the debts are between different parties in different capacities, and are thus not mutual). If, however, DuPont's claim is simply a claim transferred postpetition, it is expressly prohibited from setoff under § 553(a)(2)(A).

Because I find that DuPont's claim is not a claim for reimbursement or subrogation, but rather a claim transferred by Tokai postpetition, DuPont is not entitled to a setoff.

 a. *Claim for reimbursement*

■ DuPont asserts that the Rebate Agreement is a guaranty, thereby entitling DuPont to a claim for reimbursement against Debtor. Pennsylvania law controls the interpretation of the Repurchase Agreement.

A "guaranty", or suretyship, is defined as:

[T]he relation which exists where one person has undertaken an obligation and another person is also under an obligation or other duty to the obligee, who is entitled to but one performance, and as between the two who are bound, one rather than the other should perform.

Restatement of the Law, *Security,* § 82 (1941). *See also Crestar Mortgage Corp. v. Peoples Mortgage Co.,* 818 F.Supp. 816, 819 n. 4 (E.D.Pa.1993) (stating that a guaranty is a promise to answer for the debt, default or miscarriage of another). "The surety may have undertaken his obligation as a result of direct dealings with the creditor without the consent of the principal or even without his knowledge." Restatement § 82, comment f. A suretyship may be created where the surety contracts with the creditor by a separate instrument in which the principal contracts with the creditor. *Id.* § 83(a). Where a surety performs on account of the principal, the surety is entitled to reimbursement. *Id.* § 104(b).

In the present case, the Repurchase Agreement, on its face, resembles a standard guaranty. It states that DuPont "absolutely and unconditionally guarantees ... the prompt payment of all rent" to be paid by Debtor under the lease. In ascertaining the nature of the Repurchase Agreement, however, I cannot look just to its language, but must consider its purpose and effect. The Repurchase Agreement provides that, upon the Debtor's default, DuPont has two options: perform the Lease obligations, or repurchase the Equipment and the Lease. Whether the Repurchase Agreement operates as a guaranty depends on the option elected.

Had DuPont performed the obligations under the Lease, it would have been "out" the money it paid to Tokai (representing approximately 44 months of lease payments). In that instance, DuPont would have been entitled to a claim for reimbursement, and Debtor would have had the obligation to make DuPont "whole" for its performance under the Repurchase Agreement.

Here, DuPont exercised its right to repurchase the Equipment. It did not pay the full amount of Tokai's claims arising out of the Lease. Rather, it chose the lesser alternative by paying a predetermined amount of money, $415,332.30, and, in return, receiving the Equipment which may or may not have had a value equal to the amount it was required to pay under the stipulated loss schedule. It also received in return Tokai's assignment of the Lease with the corresponding claims Tokai had against the Debtor under the Lease. If DuPont were entitled to reimbursement of the amount it paid for the Equipment, and if the value of the Equipment equals what it paid, it would receive a windfall: DuPont would be in possession of the equipment, and at the same time would be fully compensated by the Debtor for the purchase price.[11] This cannot be the equitable result. As such, once DuPont decided to repurchase the Equipment from Tokai, in fairness and in good common sense, it

11. There is no evidence in the record demonstrating the relationship between the stipulated loss value and the value of the Equipment.

lost any rights to claim the benefits of a guarantor because that is not what it did.

This result not only makes sense, it gives meaning to all aspects and the economic realities of the Repurchase Agreement, rather than focusing on selected words and particular obligations. The Agreement states that Dupont was to guaranty the prompt payment of all rent under the Lease; *or* DuPont was to purchase the Equipment and be assigned the Lease for the purchase price. Under the first option, the amount due Tokai would have been identical to the amount Debtor owed Tokai at the time of default and the effect of the transaction would have been a suretyship or guaranty. Under the second option, the amount due to Tokai for the repurchase bore no relation to, nor was dependent upon, Debtor's liability to Tokai. The amount due likely bore some relationship to DuPont's analysis of the value of the Equipment. Accordingly, DuPont's claim is not a claim for reimbursement.

### b. *Subrogation claim*

 DuPont next asserts that its claim may be characterized as a subrogation claim. Subrogation is founded on the notion that "one who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against the other." *American Surety Co. v. Bethlehem Nat'l Bank,* 314 U.S. 314, 317, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941). A classic example of an entity possessing a right to subrogation would be a surety, a guarantor or an endorser. Yet, "neither equity nor [§ 509(a)] requires a party seeking subrogation to be a surety or a guarantor." *In re Valley Vue Joint Venture,* 123 B.R. 199, 208 (Bankr. E.D.Va.1991).

 Section 509(a) of the Code governs subrogation. It provides that "an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment." 11 U.S.C. § 509(a). Based on this language, to subrogate a claim under § 509(a), one must establish that: (1) the creditor is *liable with* the debtor on (or has secured); (2) *a claim* of a creditor

against the debtor; and (3) the creditor must have *paid* that claim.

Courts disagree as to what is required to subrogate a claim under § 509. The debate centers around whether subrogation is governed exclusively by § 509, or whether the creditor seeking subrogation under § 509 must also satisfy a five-part test commonly referred to as equitable, or legal, subrogation.

Equitable subrogation is a creature of equity that exists independent of statute. 73 Am.Jur.2D, *Subrogation* § 3 (1974). Equitable subrogation is appropriate if the following factors are present:

(1) The payment must have been made by the subrogee to protect his own interest;

(2) The subrogee must not have acted as a volunteer;

(3) The debt paid must be one for which the subrogee was not primarily liable;

(4) The entire debt must have been paid; and

(5) Subrogation must not work any injustice to the rights of others.

*Id.* § 11. Over the years, this five-part test has evolved as a requirement to § 509 of the Code. *See Valley Vue Joint Venture,* 123 B.R. at 203 n. 7 (outlining the progression of equitable subrogation to § 509).

For example, in *Towers v. Moore (In re DiSanto & Moore Assocs., Inc.),* 41 B.R. 935 (N.D.Cal.1984), a federal district court, relying solely on a state court decision, adopted equitable subrogation in a bankruptcy case. A few years later, in *Baxter v. Flick (In re Flick),* 75 B.R. 204, 206 (Bankr.S.D.Cal.1987), a California bankruptcy court again applied the test. Then, in 1988, the court in *In re Trasks' Charolais,* 84 B.R. 646 (Bankr.D.S.D. 1988) applied these factors to § 509, citing *Flick* and *DiSanto* as authority. The court made no distinction that it was applying the mandate of § 509 or the doctrine of equitable subrogation. Instead, the court simply stated that the five factors must be satisfied for subrogation to be achieved under § 509. *Id.* at 646. This five-part test was subsequently adopted, without any explanation, by the

court in *In re Leedy Mortgage Co.*, 111 B.R. 488, 491–92 (Bankr.E.D.Pa.1990).[12]

Only recently have courts begun to consider whether § 509 of the Code mandates the application of equitable subrogation.[13] Yet, to date, there is little uniformity on the issue. For example, some courts do not distinguish between equitable subrogation and § 509. These courts simply adopt equitable subrogation as the test of § 509. *See, e.g., Buckeye Union Ins. Co. v. Four Star Constr. Co. (In re Four Star Constr. Co.)*, 151 B.R. 817, 821 (Bankr.N.D.Ohio 1993). Other courts have held that a party asserting subrogation under § 509 must satisfy the requirements of § 509 *in addition to* the equitable subrogation test. *See, e.g., CCF, Inc. v. First Nat'l Bank & Trust Co. (In re Slamans)*, 175 B.R. 762, 765 (N.D.Okla.1994); *Old Republic Sur. Co. v. Richardson (In re Richardson)*, 178 B.R. 19 (Bankr.D.D.C.1995); *Bank of America Nat'l Trust & Sav. Ass'n v. Kaiser Steel Corp. (In re Kaiser Steel Corp.)*, 89 B.R. 150, 152 (Bankr.D.Colo.1988). Another line of cases reasons that § 509 provides an additional, but not exclusive, remedy in bankruptcy. In other words, a creditor need not satisfy *both* tests, but need only to satisfy § 509 or the equitable subrogation test. *See, e.g., McAllister Towing v. Ambassador Factors (In re Topgallant Lines, Inc.)*, 154 B.R. 368, 382 (S.D.Ga.1993), *aff'd*, 20 F.3d 1175 (11th Cir.1994) (stating that § 509 does not exist in a vacuum); *Berliner Handels–Und Frankfurter Bank v. East Texas Steel Facilities, Inc. (In re East Texas Steel Facilities, Inc.)*, 117 B.R. 235, 241 (Bankr.N.D.Tex. 1990) (applying both tests without explanation); *In re Spirtos*, 103 B.R. 240, 245 (Bankr.C.D.Cal.1989). Finally, a handful of courts have held that, given the codification of subrogation in § 509, equitable subrogation does not apply. Rather, to subrogate a claim in bankruptcy, one need only satisfy the elements set forth in § 509. *Creditor's*

*Comm. v. Massachusetts Dep't of Revenue*, 105 B.R. 145, 154 (D.Mass.1989); *Cooper v. Cooper (In re Cooper)*, 83 B.R. 544, 546 (Bankr.C.D.Ill.1988).

In *Feldhahn v. Feldhahn (In re Feldhahn)*, 929 F.2d 1351 (8th Cir.1991), the Eighth Circuit applied the doctrine of equitable subrogation, as set forth in *Leedy*. However, in a footnote, the court stated:

> Our use of the *Leedy* test in this case does not mean that we believe it is the only proper analysis for a § 509(a) claim. We note that the *Leedy* factors do not strictly follow the language of § 509(a). We also note that the *Leedy* test has its origins in equitable subrogation cases, not § 509 cases, and that some courts consider these distinct forms of subrogation.

*Id.* at 1354 n. 4 (citations omitted). The Eighth Circuit, therefore, has not ruled on this issue.

 I need not decide which of these many lines of analysis is correct for it is clear that, using either § 509(a) or equitable subrogation, the entity asserting a right to subrogation must have been liable to the creditor along with the debtor. No line of analysis allows a party to seek subrogation where the debtor and the party asserting a right to subrogation are not co-debtors. To subrogate a claim for purposes of § 509 or for purposes of equitable subrogation one must be *liable with* the debtor. The term "liable with" means that "the parties are liable to the same creditor at the same time on the same debt. The word 'with' has been defined as sometimes equivalent to the words 'in addition to.'" *Sun Co. v. Slamans (In re Slamans)*, 148 B.R. 623, 625 (Bankr. N.D.Okla.1992), *aff'd*, 175 B.R. 762, 764 (N.D.Okla.1994) (citations omitted). Also, the party asserting the subrogation rights must have *paid* the claim.

---

12. Some courts now commonly refer to the five-part test, which encompasses equitable subrogation, as the "*Leedy* test."

13. *See, e.g., Pandora Indus., Inc. v. Paramount Communications, Inc. (In re Wingspread Corp.)*, 145 B.R. 784, 787 (S.D.N.Y.1992) ("Given this uncertain relation, I will consider both § 509 and the doctrine of equitable subrogation in reaching my decision."), *aff'd* 992 F.2d 319 (2d

Cir.1993); *Valley Vue*, 123 B.R. at 203 n. 7; *Beach v. First Union Nat'l Bank (In re Carley Capital Group)*, 118 B.R. 982, 989 (Bankr. W.D.Wis.) ("I need not decide whether these two remedies are independent or interdependent of one another, or whether there even exists a right to assert legal subrogation in bankruptcy."), *aff'd*, 119 B.R. 646 (W.D.Wis.1990).

Under one scenario, that in which DuPont was liable with the Debtor for the lease payments and paid them, a right to subrogation could have arisen. Under the scenario which occurred, however, DuPont was not liable with the Debtor for the debt and it did not pay that debt. Rather, in a segregated transaction DuPont repurchased the Equipment *for its stipulated loss value.* To hedge its bets and presumably improve the economics of the situation, DuPont contracted for the right to repurchase the Equipment and the claims under the Lease. Only if the value of the Equipment and the rights purchased under the Lease do not equal the purchase price paid is there the slightest element of answering for the debt of another. In essence, this was a purchase of rights and claims for purposes of setoff, which is expressly disallowed. If DuPont were allowed to set off, it would have the Equipment and claims under the Lease, as well as a claim against Debtor for the purchase price. This is not the gist of subrogation. It is merely an attempt to foist upon Debtor DuPont's obligation to Tokai for the purchase price of what it received.

In conclusion, DuPont has a claim against Debtor that was transferred by Tokai postpetition. Any claim transferred postpetition is not entitled to setoff under § 553(a)(2)(A). The purpose of § 553(a)(2)(A) is to prohibit the trafficking of claims against a debtor in order to effect a setoff—which would provide a windfall to both parties at the expense of a debtor. As such, DuPont is not entitled to set off its claim against the amount owing Debtor under the Rebate Agreement.

### CONCLUSION

Debtor's motion for summary judgment is granted, in part, in the amount of $166,461.60, subject to a setoff in the amount of $387.70, representing a total of $166,073.90, plus interest. DuPont is not entitled to recoup its claim arising from the assignment of Olson's claim; nor may it set off its claim arising from the Repurchase Agreement.

### ORDER FOR PARTIAL SUMMARY JUDGMENT

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. Debtor's motion for summary judgment is GRANTED, IN PART, in the amount of $166,073.90, plus interest from May 1, 1994;

2. DuPont's motion for summary judgment is DENIED.